Richard RUNYAN, Plaintiff-Appellant,

v.

NATIONAL CASH REGISTER CORP.,
Defendant-Appellee.

No. 83–3862.

United States Court of Appeals,
Sixth Circuit.

Argued Dec. 16, 1985.

Decided April 7, 1986.

C. Daniel Karnes, Glen D. Nager, Cleveland, Ohio, for amicus curiae Eaton Corp., Firestone Tire and Rubber Co., & TRW.

Samuel Estreicher, Cahill Gordon & Reindel, New York City, for amicus curiae Center for Public Resources in support of District Court Affirmance.

Paula J. Connelly, Nat. Chamber Litigation Center, Washington, D.C., for amicus curiae Chamber of Commerce of the U.S. in support of appellee (NCR).

Paul H. Tobias (argued), Tobias & Kraus, Cincinnati, Ohio, for plaintiff-appellant.

Armistead W. Gilliam, Jr. (argued), Smith & Schnacke, Dayton, Ohio, for defendant-appellee.

Douglas S. McDowell, McGuiness & Williams, Washington, D.C., amicus curiae EEAC.

Before LIVELY, Chief Judge and ENGEL, KEITH, MERRITT, KENNEDY, MARTIN, JONES, CONTIE, KRUPANSKY, WELLFORD, MILBURN, GUY and NELSON, Circuit Judges.

WELLFORD, Circuit Judge.

Richard Runyan appeals an order of the District Court for the Southern District of Ohio granting National Cash Register Corporation's (NCR) motion for summary judgment. The court dismissed Runyan's allegation that his discharge was discrimination in violation of the Age Discrimination in Employment Act of 1967 (ADEA), 29 U.S.C. §§ 621–634 (1982). Applying Title VII analysis, the district court concluded that a general release knowingly signed by Runyan on November 25, 1977, was a complete bar to Runyan's ADEA claim, that a bona fide dispute existed respecting the reason for Runyan's termination, and that the consideration Runyan received for signing the release was adequate and not contrary to public policy. Runyan argued on appeal that his unsupervised release cannot bar his private ADEA cause of action because the ADEA incorporates the enforcement provisions of the Fair Labor Standards Act of 1938 (FLSA), 29 U.S.C. §§ 216, 217 (1982). A panel of this court agreed and reversed the district court. *Runyan v. National Cash Register Corp.*, No. 83–3862 (6th Cir.Apr. 22, 1985). The panel majority held that a release of rights under the ADEA, unsupervised by the Equal Employment Opportunity Commission or by a court, is void as a matter of law. A majority of judges in active service voted to rehear the case *en banc*, thus vacating the panel opinion and the previous judgment of the court. Rule 14, Rules of the Sixth Circuit. Following supplemental briefing, the case was argued before the full court. For the reasons that follow, we hold that a private unsupervised release under the circumstances of this case may waive ADEA rights, and thus affirm the district court.

## I. BACKGROUND

While we adopt the facts set forth in the district court's opinion, *see Runyan v. NCR Corp.*, 573 F.Supp. 1454, 1456–57 (S.D.Ohio 1983), we set out a further summary. NCR hired Runyan, who was born in 1918, at age fifty-three as an assistant general counsel in NCR's corporate legal department. In early 1977, James E. Rambo, vice president and general counsel at NCR, informed Runyan the company was going to terminate him for unsatisfactory performance. During the meeting, Runyan, then fifty-nine and an experienced labor lawyer, told Rambo that he felt his "termination was related to age discrimination."

After several subsequent discussions between Runyan and various representatives of NCR, the parties executed a written "Consulting Agreement," which became effective on June 1, 1977, but was to terminate on May 31, 1978. This agreement provided that Runyan would receive $150 per day, with a guaranteed minimum of $2,333 per month, in exchange for Runyan's continuing legal services as a consultant. In November 1977 Runyan approached Rambo and requested that NCR extend the agreement beyond May 31, 1978, and increase the compensation Runyan was receiving under the agreement. After discussing Runyan's requests with other officials of NCR, Rambo told Runyan that the company would not extend the agreement, but that it would increase Runyan's compensation to a guaranteed minimum of $4,000 per month from November 1, 1977, through May 31, 1978. NCR conditioned this increased compensation, however, on Runyan's executing a release of all claims he had or may have against NCR relating to his employment and termination.

On November 25, 1977, the parties entered into a written amendment to the prior consulting agreement, increasing Runyan's compensation to a guaranteed monthly

minimum of $4,000 to the time of termination. At the same time, Runyan signed an "Accord and Satisfaction, Release and Discharge," which provided:

In consideration of the "Amendment to Consulting Agreement" executed by NCR on November 25, 1977, receipt of which is hereby acknowledged and which I acknowledge to be in full accord and satisfaction of any and all claims I may have against NCR *arising out of the course of my employment and/or the termination of any employment* and in further consideration of the said "Amendment to Consulting Agreement," I, Richard V. Runyan, hereby release and forever discharge NCR, its successors, assigns, transferees, officers, employees, representatives and agents from all manner of action and actions, cause and causes of action, suits, debts, contracts, controversies, agreements, promises, damages, and demands whatsoever in law or in equity, which against NCR, I, Richard V. Runyan, ever had, now have, or which I hereafter can, shall or may have, for, upon, or *by reason of any matter, cause or thing whatsoever* from the beginning of the world to the day of the date of these presents, save and except the aforementioned "Amendment to Consulting Agreement" of November 25, 1977, and the underlying "Consulting Agreement of June 1, 1977."

I have read this release and understand all of its terms. I execute it voluntarily and with full knowledge of its significance.

(Emphasis added.)

On May 31, 1978, the consulting agreement expired by its own terms and Runyan's working relationship with NCR ended. Runyan accepted the increased compensation promised him. On November 27, 1978, Runyan filed a charge of age discrimination against NCR with the Secretary of Labor,[1] and on May 22, 1980, commenced this ADEA action in the district court.

## II. WAIVER UNDER THE FLSA AND ADEA

■ Runyan's principal argument on appeal is that an unsupervised waiver of his statutory rights cannot bar his private action under the ADEA. This argument is based on Congress' incorporation into the ADEA of the enforcement provisions of the FLSA, and the issue raised is one of first impression in this court. To resolve this issue, we review the historical development of the FLSA and the ADEA.

In 1938 Congress enacted the FLSA to provide for a standard minimum wage and to require additional compensation for overtime work.[2] Section 216 provides in part:

Any employer who violates the provisions ... of this title shall be liable to the employee or employees affected in the amount of their unpaid minimum wages, or their unpaid overtime compensation, as the case may be, and in an additional equal amount as liquidated damages.

29 U.S.C. § 216(b) (1982). The FLSA is silent on whether an employee can release his or her right to wages or liquidated damages. Seven years after enactment, however, in *Brooklyn Savings Bank v. O'Neil*, 324 U.S. 697, 65 S.Ct. 895, 89 L.Ed. 1296 (1945), the United States Supreme Court considered whether an employee subject to the FLSA could waive or release his right to *liquidated damages* under § 216. In each of three consolidated cases before the Court, the employer had obtained a release from its employee in exchange for

1. Under the 1977 Reorganization Act, the President transferred authority over ADEA claims from the Secretary of Labor to the Equal Employment Opportunity Commission (EEOC). We have held that the transfer, accomplished through the use of a legislative veto, was constitutional. *See Muller Optical Co. v. EEOC*, 743 F.2d 380 (6th Cir.1984). This change does not affect this appeal.

2. 29 U.S.C. § 206 provides for a standard minimum wage for employees engaged in commerce or in the production of goods for commerce. 29 U.S.C. § 207 requires that such employees be compensated at a rate equal to one and one half times the regular rate for hours worked in excess of a forty hour workweek.

an amount less than the employee's full FLSA entitlement.[3]

The Court, influenced by its perception of legislative intent, held that an employee cannot privately waive his right to liquidated damages, at least when no bona fide dispute exists between the parties regarding the FLSA's coverage:

> The statute was a recognition of the fact that due to the unequal bargaining power as between employer and employee, certain segments of the population required federal compulsory legislation to prevent private contracts on their part which endangered national health and efficiency .... To accomplish this purpose, standards of minimum wages and maximum hours were provided. Neither petitioner nor respondent suggests that the right to the basic statutory minimum wage could be waived by any employee subject to the Act. No one can doubt but that to allow waiver of·statutory wages by agreement would nullify the purposes of the Act. We are of the opinion that the same policy considerations which forbid waiver of *basic minimum and overtime wages* under the Act also prohibit waiver of the employee's right to liquidated damages.

3. Brooklyn Savings Bank employed O'Neil as a night watchman for its eleven-story office building. He claimed to have worked several overtime hours, but had not received compensation at the FLSA-prescribed time and a half rate. Brooklyn Savings offered O'Neil, and he accepted, a check for $423.16 in exchange for a release of all claims. The check covered the appropriate statutory overtime amount, but no liquidated damages under § 216(b).

In the second consolidated case, a box factory employee worked certain hours of statutorily defined overtime. His employer offered him a check for $500.00, an amount less than the overtime compensation to which the employee was entitled, in exchange for a release of all FLSA rights. Both parties were aware that under the FLSA more than $500.00 was due to the employee. The employee sued for the balance of statutory compensation due and liquidated damages.

In the last of the consolidated cases, the employee accepted a delayed payment of statutory overtime compensation, which the employer asserted was a release of any claim to liquidated damages under the FLSA.

4. *Gangi* concerned building and maintenance employees. Each had put in varying hours of

*Id.* at 706–07, 65 S.Ct. at 902 (footnote omitted) (emphasis added). The Court did not decide whether an employee can waive the right to liquidated damages when a bona fide dispute regarding FSLA's coverage does exist.

The Supreme Court partially resolved the question left open in *O'Neil* in *Schulte, Inc. v. Gangi,* 328 U.S. 108, 66 S.Ct. 925, 90 L.Ed. 1114 (1946).[4] The Court addressed whether the FLSA precludes a bona fide settlement of a bona fide dispute over the Act's *coverage* on a claim for overtime compensation and liquidated damages when the employee received the overtime compensation in full. The Court concluded:

> We think the purpose of the Act, which we repeat from the *O'Neil* case was to secure for the lowest paid segment of the Nation's workers a subsistence wage, leads to the conclusion that neither wages nor the damages for withholding them are capable of reduction by compromise of controversies over coverage.

*Id.* at 116, 66 S.Ct. at 929 (footnote omitted.)[5]

Although the Court in *Gangi* held that settlements of bona fide disputes as to

overtime for which no payment had been made prior to the Supreme Court's decision in *Kirschbaum Co. v. Walling,* 316 U.S. 517, 62 S.Ct. 1116, 86 L.Ed. 1638 (1942), in which service and maintenance employees in buildings tenanted by manufacturers producing for interstate commerce were held to be covered by the FLSA. The employees then made claims for overtime compensation and liquidated damages. The employer refused to pay on the grounds that its tenants did not ship their products directly into interstate commerce. Under threat of suit, the employer paid the overtime compensation and obtained a release of further claims from the employees.

5. It was this strong language that prompted Congress to enact the Portal-to-Portal Act in 1947. 29 U.S.C. § 260 (1982). That statute gave courts the discretion to withhold an award of liquidated damages upon the employer's satisfactory showing that the act or omission giving rise to the FLSA claim was in good faith and that the employer had reasonable grounds for believing that the act or omission was not a violation of the FLSA.

coverage of the Act are invalid, it specifically *did not* "consider ... the possibility of compromises in other situations which may arise, such as a dispute over the number of hours worked or the regular rate of employment." *Id.* at 114–15, 66 S.Ct. at 928–29 (footnote omitted). The Court cited *Strand v. Garden Valley Telephone Co.,* 51 F.Supp. 898 (D.Minn.1943), as addressing the remaining issue it left open. 328 U.S. at 115 n. 10, 66 S.Ct. at 928 n. 10. In *Strand,* the district court distinguished bona fide disputes over legal issues—for which settlement agreements are not valid—from bona fide disputes over factual issues—for which compromises or settlements are valid and binding. 51 F.Supp. at 904–05; *accord Rigopoulos v. Kervan,* 47 F.Supp. 576 (S.D.N.Y.1942) (settlement not bar to recovery of liquidated damages absent allegation that an honest dispute existed respecting whether employees had worked overtime hours); *Weiss v. Testrite Instrument Co.,* 272 A.D. 696, 74 N.Y.S.2d 673 (1947); *Cassese v. Manufacturers Trust Co.,* 182 Misc. 344, 46 N.Y.S.2d 621 (N.Y.City Ct. 1943).

Congress enacted the ADEA in 1967. In § 7(b) of the Act, as codified at 29 U.S.C. § 626(b), Congress expressly incorporated the enforcement provisions of the FLSA:

> The provisions of this chapter shall be enforced in accordance with the powers, remedies, and procedures provided in sections 211(b), 216 (except for subsection (a) thereof), and 217 of this title .... Amounts owing to a person as a result of

a violation of this chapter shall be deemed to be unpaid minimum wages or unpaid overtime compensation for purposes of sections 216 and 217 of this title: *Provided,* That liquidated damages shall be payable only in cases of willful violations of this chapter....

29 U.S.C. § 626(b) (1982). Neither the Act nor its legislative history explicitly addresses whether ADEA rights may be privately released.[6]

The purposes behind enactment of the ADEA and the earlier enactment of the FLSA are, however, obviously different. The latter pertained to all workers governed by a national standard setting minimum compensation for workers and to secure "the lowest paid segment .... a subsistence wage." *Gangi,* 328 U.S. at 116, 66 S.Ct. at 929. The ADEA, on the other hand, addressed itself to an entirely different segment of employees, many of whom were highly paid and capable of securing legal assistance without difficulty. Congress intended to protect this group from discrimination in favor of younger employees. In accordance with the distinction between FLSA and ADEA claimants, a practice, even if not officially sanctioned, has developed that permits effectuating and recognizing settlements of ADEA disputes that employees and employers have worked out in good faith without agency involvement.

### III. WAIVER IN THIS CASE

■ In applying the law to the facts of this case, we are mindful that we must

---

**6.** Plaintiff maintains that *Barrentine v. Arkansas-Best Freight System,* 450 U.S. 728, 101 S.Ct. 1437, 67 L.Ed.2d 641 (1981), and *Tony & Susan Alamo Foundation v. Secretary of Labor,* — U.S. ——, 105 S.Ct. 1953, 85 L.Ed.2d 278 (1985), require application of the no waiver rule to all unsupervised ADEA releases. But *Barrentine* and *Alamo* are clearly distinguishable from the present case. First, they both concerned the waiver of *legal coverage* under the FLSA. In *Barrentine* the issue was whether the FLSA required the employer to pay employees for time they spent complying with safety requirements. 450 U.S. at 730–32, 101 S.Ct. at 1439–40. The issue was not whether the employees made the safety inspections or how many hours they worked. Rather, the issue was whether the

FLSA requires compensation for this kind of work performed by these employees. In *Alamo* the workers wanted to stipulate that their work was "voluntary" and therefore not covered under the FLSA. 105 S.Ct. at 1962. Neither of these cases concerned the resolution of the type of factual issue referred to in *Gangi.* Second, *Barrentine* and *Alamo* concerned an FLSA claim, not an ADEA claim as in the present case. In *Barrentine* and *Alamo* the Court reiterated the well known problems arising from the unequal bargaining positions of employers and employees, 105 S.Ct. at 1962, and "substandard wages and oppressive working hours," 450 U.S. at 739, 101 S.Ct. at 1444. FLSA cases implicate these concerns to a significantly greater degree than do ADEA cases.

assume that Congress, by referring to the FLSA enforcement provisions in enacting the ADEA, was aware of judicial interpretation of the FLSA. *Lorillard v. Pons,* 434 U.S. 575, 98 S.Ct. 866, 55 L.Ed:2d 40 (1978). But we are satisfied that the present case concerns an issue that the Supreme Court in *Gangi* specifically left undecided. In this case, a bona fide dispute does exist concerning whether NCR discharged Runyan in violation of the ADEA. The dispute is not over legal issues such as the ADEA's coverage or its applicability. Rather, the parties contest factual issues concerning the motivation and intent behind NCR's decision to discharge Runyan. This case presents the precise issue not resolved in *O'Neil* and *Gangi.*[7] It presents an issue analogous to the factual dispute discussed in *Strand* and the other cases cited earlier, respecting which those courts would have found settlements valid and binding.[8]

Accordingly, we hold that an unsupervised release of a claim in a bona fide *factual* dispute of this type under these circumstances is not invalid.[9] In this case it is clear that Runyan is not among the "lowest paid segment of the nation's workers" who likely have little education and little understanding of their legal rights, a

factor which the Court in *O'Neil* and *Gangi* deemed very important. Rather, Runyan is a well-paid, well-educated, labor lawyer with many years of experience in this area. Indeed, evidence in the record suggests Runyan tried to take advantage of NCR by taking the full benefit of a reasonable and understood bargain, while attempting to part with what he thought might be only illusory consideration in return. The release in this case was knowingly and deliberately executed by an attorney knowledgeable in labor law and employment discrimination matters.[10] It is very different from cases concerning releases of FLSA claims by lay persons seeking payment of minimum wages, in amounts ascertainable by uncomplicated methods, usually with little knowledge of their legal rights.

## IV. WAIVER IN ADEA CASES

■ We have decided that under particular circumstances employers and employees may negotiate a valid release of ADEA claims. We recognize, however, that in accord with concerns expressed in *O'Neil* and *Gangi* courts should not allow employers to compromise the underlying policies of the ADEA by taking advantage of a

---

7. The Fifth Circuit's decision in *United States v. Allegheny-Ludlum Industries, Inc.,* 517 F.2d 826 (5th Cir.1975), *cert. denied,* 425 U.S. 944, 96 S.Ct. 1684, 48 L.Ed.2d 187 (1976), supports our narrow reading of *O'Neil* and *Gangi. In Allegheny-Ludlum,* the court declined to extend the highly protective public policy rationale of *O'Neil* and *Gangi* to the Title VII context. *Id.* at 861. The court alluded to the viability of the *Strand* limitation on *Gangi.* It held that *O'Neil* and *Gangi* do not prohibit employees from "accept[ing] compromise payments and waiv[ing] their claims for further relief in situations where the fact of liability or the amount thereof is disputed." *Id.* at 860.

8. It is not surprising that courts have found FLSA releases unenforceable given the nature of the factual issues they concern. In FLSA cases the factual issues concern the number of hours worked and the base pay rate—both of which are amenable to determination with some precision. In ADEA cases, on the other hand, the factual issues frequently concern determination of motive and intent, controversies that are more difficult to resolve.

9. Several previous cases in this circuit have pointed toward the result we reach today. In *Ott v. Midland-Ross Corp.,* 600 F.2d 24 (6th Cir.1979), defendant argued that a valid release barred plaintiff's ADEA claim. The plaintiff argued that the court should estop defendant from enforcing the release because it was fraudulently induced. The court did not indicate that the release was void as a matter of law. It assumed the release would be valid if not fraudulently induced. 600 F.2d at 30 n. 6. *See also Ackerman v. Diamond Shamrock Corp.,* 670 F.2d 66 (6th Cir.1982) (held waiver of ADEA claim valid without discussing the need for EEOC supervision; the facts as discussed in the opinion suggest that the EEOC did not supervise the release).

10. We reject plaintiff's argument that the waiver does not apply to ADEA claims because it did not specifically refer to the ADEA. In determining whether plaintiff knowingly and voluntarily waived his ADEA claims, we apply ordinary contract principles.

superior bargaining position or by over-reaching. Justice Frankfurter, in his *Gangi* dissent, 328 U.S. at 121–22, 66 S.Ct. at 931–32, noted the importance of good faith in entering settlements and in approving a waiver of rights in this type of situation:

> Before a hitherto familiar and socially desirable practice is outlawed, where overreaching or exploitation is not inherent in the situation, the outlawry should come from Congress.
>
> ... Strict enforcement of the policy which puts beyond the pale of private arrangement minimum standards of wages and hours fixed by law does not call for disregard of another policy, that of encouraging amicable settlement of honest differences between men dealing at arm's length with one another.

*Id.* at 122, 66 S.Ct. at 932.

In determining whether an ADEA settlement and release is valid, a court should apply the principles expressed by Justice Frankfurter that encourage "amicable settlement of honest differences ... where overreaching or exploitation is not inherent in the situation." Ordinary contract principles would apply in such a situation as stated in footnote ten. We note that the EEOC has specifically proposed "allowing for non-EEOC supervised waivers and releases of private rights under the ADEA." Draft Notice of Proposed Rulemaking, *reprinted in* 141 Daily Lab.Rep. (BNA) A–6, A–7 (July 23, 1985). The agency's expressed basis for this proposal is its preference to encourage voluntary resolution of disputes under the ADEA.[11] We share these expressed views of the agency charged with responsibility of enforcement of the ADEA.

Accordingly, we hold that Runyan's release is valid and the district court's judgment is AFFIRMED.

ENGEL, Circuit Judge, joined by NA-THANIEL R. JONES, Circuit Judge, dissenting.

I respectfully dissent. I adhere to my views expressed in the original panel opin-ion. 37 F.E.P. Cases (BNA) 1086 (6th Cir. 1985), *vacated,* 38 F.E.P. Cases (BNA) 5 (6th Cir.1985). My comments augment the rationale of Judge DeMascio in that opinion. I concurred in that opinion primarily because I believed its result most closely reflected the intent of Congress, which preferred the remedial procedures of the Fair Labor Standards Act, as applied in *Brooklyn Savings Bank v. O'Neil,* 324 U.S. 697, 65 S.Ct. 895, 89 L.Ed. 1296 (1945), and *Schulte, Inc. v. Gangi,* 328 U.S. 108, 66 S.Ct. 925, 90 L.Ed. 1114 (1964), over those of Title VII. *See Lorillard v. Pons,* 434 U.S. 575, 98 S.Ct. 866, 55 L.Ed.2d 40 (1978). The majority may propose a better contrived rule, but in my opinion, it lacks fidelity to the intent of Congress.

The majority opinion concedes that *O'Neil* and *Gangi* prohibit unsupervised releases of ADEA claims when the dispute concerns the coverage of the Act or some other legal issue. It holds, however, that because the dispute here involves a factual issue, NCR's intent in discharging Runyan, the present case falls within the area expressly left undecided by *O'Neil* and *Gangi*. It then concludes that unsupervised releases of ADEA claims are valid where the parties contest factual matters and the release does not violate ordinary principles of contract law.

I am not persuaded. It seems to me that the majority ignores the logic of the principal decisions of the Supreme Court in favor of a reasoning that it imputes to a mere exemption lodged in a footnote. I submit that while there may be differences, evident to Congress as well as the courts, between the classes protected by the ADEA and FLSA, I can discern no less solicitude toward the aging worker, either in the language of the ADEA or in its legislative history. The ADEA itself reflects this when, in its statement of findings and purpose, the Act states, "older workers find themselves disadvantaged in

---

**11.** The EEOC notes that this is similar to the policy encouraging settlement of cases concern-ing rights under Title VII of the Civil Rights Act of 1964.

their efforts to retain employment...." 29 U.S.C. § 621. Surely Congress was aware when it enacted the ADEA that causes of action and hence appropriate remedies would differ under the ADEA and the FLSA, yet it adopted and has since retained the remedial mechanism of the FLSA. Furthermore, I fail to see that the distinctions relied upon by the majority compel this judicial amendment. The relative availability of legal counsel for ADEA claimants may do little to equalize the disparity of bargaining power between employees and employers when the dispute centers on a factual question of employer intent. And while factual disputes in ADEA claims may offer less opportunity for certain resolution, the increased uncertainty of their claims does not place ADEA claimants in a better position with respect to their employers than FLSA claimants, or otherwise compel a diminution of their statutory protections.

One might doubt the wisdom of Congress in enacting or structuring the ADEA, or believe that, however well-intentioned, the ADEA in its overall impact has been counterproductive to the continued employment of the elderly; that judgment, however, is not ours to make. When Congress, with its broad investigatory machinery, concludes that the ADEA's remedial mechanism must be changed, it will act. Meanwhile, I believe we must accord the elderly the full strength and protections of the remedies afforded them.

Admittedly, on its facts this is not an attractive case. One is left with the distinct impression that Runyan, himself a lawyer, artfully deceived his employer by drafting a release which made no mention of the ADEA claim. Perhaps so, but as much might also be said of NCR when it executed the release. Perhaps both took the chance: Runyan that NCR would not notice the failure to refer to the ADEA claim, and NCR that Runyan might initially overlook the possibility and later consider himself barred from asserting his rights under the ADEA. It is idle, however, to believe that even here the parties enjoyed parity of bargaining power. Even lawyers can experience hard choices when, approaching advanced age, they are faced with discharge after years of service to a corporate employer. But even more important, that vast majority of persons intended to be benefitted by the Act will not be attorneys, nor possessed of an attorney's sophistication in legal matters. Obviously, Congress intended the Act to apply to a broad class of persons, limited only by the limits of age. It did not include language separating lawyers from all others in the class.

Even if I were convinced by the majority that the original panel's assessment of Congressional intent was incorrect and that unsupervised settlements were allowable, I believe I should still have great difficulty in upholding a settlement and waiver that failed altogether to make any mention of rights under the ADEA. It seems to me that only a bright line requirement that any waiver, to be effective as to ADEA rights at all, must expressly mention them in order to give substantial measure of protection to the class. Such a rule would at least keep the vast majority of cases out of the courts. Any employee seeking relief, notwithstanding a specific waiver, would of course rightfully bear the burden of establishing traditional equitable grounds for avoidance or rescission before overcoming the effect of such a waiver. While this would probably require reversal of the district court judgment in this appeal, it would still in my view be justified and hold truer to Congressional intent than the position taken by the majority.