**Luciano MASSI, Plaintiff,**

v.

**BLUE CROSS & BLUE SHIELD MUTUAL OF OHIO, et al.,**
**Defendants.**

No. C87–3099.

United States District Court,
N.D. Ohio, E.D.

May 22, 1991.

David A. Forrest, Jeffries & Monteleone, Cleveland, Ohio, for plaintiff.

Michael J. Frantz, Carl H. Gluek, Thompson, Hine & Flory, Cleveland, Ohio, for defendants.

## ORDER

BATTISTI, District Judge.

Before the court is Defendant Blue Cross & Blue Shield of Ohio's ("Blue Cross") motion for summary judgment. Plaintiff Luciano Massi's complaint alleges violations of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.*, and asserts state law claims for breach of employment contract, promissory estoppel, and negligent and/or intentional infliction of emotional distress. Plaintiff seeks declaratory relief and an award of back pay, compensatory damages and punitive damages.

Jurisdiction in the federal district court is predicated upon the alleged violations of the federal statute, 28 U.S.C. § 1331, and the doctrine of pendent jurisdiction.

## I. FACTUAL BACKGROUND

Plaintiff was initially hired by Blue Cross in 1967. Deposition of Luciano Massi (hereinafter referred to as the Massi Deposition), taken October 8, 1988, at 9. Massi held several positions with Blue Cross, the last being Financial Research Coordinator. *Id.* at 12.

The parties have provided somewhat varying descriptions of the Plaintiff's duties as a Financial Research Coordinator.

Massi claims that his job was to gather statistical and financial reports and data from hospitals, analyze the data submitted, and then generate reports which were used internally by Blue Cross. In addition, he claims to have provided services to hospitals and nursing homes such as preparing special reports and interpreting data.

The Defendant claims that "Plaintiff was responsible for collecting historical cost data from hospitals and nursing homes and from this data he would generate the quarterly cost report which provided historical cost data of medical providers in Northern Ohio." Defendant's Motion for Summary Judgment, at 3; see Defendant's Motion for Summary Judgment, Exhibit A (Affidavit of Thomas Campanella) (hereinafter referred to as the Campanella Affidavit), at ¶ 4.

The Defendant claims that the importance of quarterly cost reports diminished greatly when Blue Cross changed from a retrospective reimbursement plan to a prospective reimbursement plan shortly before February, 1986. See Campanella Affidavit, at ¶¶ 2–4. Allegedly as a result of this change, Campanella, the Director of Provider Finance Contracting[1] at Blue Cross, determined that Plaintiff's position could be eliminated with any essential duties being transferred to the Plaintiff's immediate supervisor, Jonathan Swift.[2] Id. at ¶ 4.

On March 26, 1986, an Open Positions Form was posted on bulletin boards in the Defendant's building. Massi Deposition, Defendant's Exhibit 10 (copy of Open Positions Form). The form announced an opening for a Financial Analyst who would report to Campanella. The duties involved in the position were described as follows:

1) Analyze financial information used to negotiate on a provider-by-provider basis;

2) help in the planning and monitoring of the DRG system;

3) help negotiate financial reimbursements with providers; [and]

4) assist Manager and Director on special projects.

Id. The form also listed the following six qualifications:

1. Graduate business degree (MBA) or CPA or extensive work experience as a financial analyst.

2. Experience interfacing with senior management.

3. Four (4) years working experience in a business environment.

4. Excellent written and oral communications skills.

[5.] Familiarity with personal computers and general software applications.

[6.] Exposure to insurance or health care industry.

Id.

On April 15, 1986, Campanella and John Surgala, the Manager of Employee Relations, informed the Plaintiff that his position was being eliminated. At the time, the Plaintiff was forty-four years old.

Surgala then asked the Plaintiff to review a voluntary resignation agreement, and subsequently went through its various terms and conditions with the Plaintiff. Massi Deposition, at 173. Plaintiff stated that "[Surgala] told me ... 'This is your agreement. And make sure you read it, you understand it, you feel comfortable with it.' He was honest about it." Id. at 173–74.

When Plaintiff questioned Surgala about the consequences of not signing the agreement he was allegedly told that if he didn't sign, he would not receive any benefits. Id. at 175. Asked if he could have a copy to take with him to review, the Plaintiff was allegedly told that he could have all the copies he wanted after he signed the agreement. Id. at 176.

---

[1.] The Provider Finance Contracting Unit implements Blue Cross' institutional reimbursement procedure.

[2.] Campanella claims that after the Plaintiff's departure, the quarterly cost report was reduced from a seventy page document to a three page document and eventually eliminated in January, 1989.

After requesting that some incorrect dates be changed, the Plaintiff signed the agreement. The agreement essentially provided the Plaintiff with salary and health insurance for three months from the date of discharge, and for an additional three months if he was unable to find work.[3] In return, the Plaintiff agreed to voluntarily resign, and accepted the following waiver:

> In consideration of the premises herein contained, *Employee hereby releases and discharges [Blue Cross],* its subsidiaries and affiliates, and officers, directors, employees and agents of any of the foregoing, *from and against any and all claims, liabilities, causes of action, or otherwise whether or not known, accrued, or matured, arising out of the relationship between Employee and [Blue Cross],* as it may have existed prior to the date hereof. *Employee understands and agrees that the foregoing includes,* without limiting the generality of the foregoing, all claims for compensation, fringe or other benefits, or *any claims asserted as a consequence of any form of discrimination under any applicable laws, doctrines, regulations or otherwise....*

*See* Plaintiff's Complaint, Exhibit A (copy of agreement) (emphasis added).

Plaintiff admits that he has received all of the benefits promised in the agreement, including the additional three months of salary and benefits.

Plaintiff has submitted the affidavits of two other former Blue Cross employees which indicate that the treatment afforded the Plaintiff was not unusual. *See* Affidavits of Robert Flowers and Robert Wright, affixed to Plaintiff's Brief in Opposition to Defendant's Motion for Summary Judgment.

Shortly after Mr. Massi left Blue Cross, Campanella requested that Mary Burkhart be transferred into the Provider Finance Contracting Unit. Campanella Affidavit, at ¶ 5. Campanella claims that Burkhart was a Financial Analyst in another unit and an "expert" in the area of the newly adopted prospective reimbursement plan. *Id.* Campanella further asserts that Burkhart possesses an MBA degree, remained a Financial Analyst in the Provider Finance Contracting Unit, and that the position of Financial Analyst involved a "completely different job responsibility" than the position formerly held by the Plaintiff.[4] *Id.* at ¶¶ 5–6.

Plaintiff alleges that he was in fact replaced by Ms. Burkhart because she was younger and because his salary requirements were higher due to his many years of service with defendant employer. In the alternative, Plaintiff claims that he met the minimum requirements for the job filled by Ms. Burkhart.

On November 24, 1987, Plaintiff filed his complaint in the instant action. In it, he alleged violation of the ADEA, breach of employment contract, promissory estoppel, and negligent and/or intentional infliction of emotional distress.

## II. STANDARD OF REVIEW

The granting of summary judgment is proper "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In considering a motion for summary judgment, the court must view all facts and inferences in a light most favorable to the nonmoving party. *Sims v. Memphis Processors, Inc.,* 926 F.2d 524, 527–28 (6th Cir.1991) (citation omitted).

**3.** The agreement also had a handwritten addition, which stated that Blue Cross would not contest Plaintiff's application for unemployment insurance benefits after his severance compensation had expired. It is not clear whether this addition was the result of negotiation or was added by Surgala for some other reason.

**4.** Campanella claims that Burkhart was "responsible for monitoring the [prospective reimbursement] system and she helped negotiate financial reimbursement for providers." Campanella Affidavit, at ¶ 6.

"The moving party has the burden of showing the absence of genuine disputes over facts which, under the substantive law governing the issue, might affect the outcome of the action." *Harris v. Adams*, 873 F.2d 929, 931 (6th Cir.1989) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). By contrast, the nonmoving party "is required to present some significant probative evidence which makes it necessary to resolve the parties' differing versions of the dispute at trial." *60 Ivy Street Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir. 1987) (citing *First Nat'l Bank of Arizona v. Cities Serv. Co.*, 391 U.S. 253, 288–89, 88 S.Ct. 1575, 1592–93, 20 L.Ed.2d 569 (1968)). The nonmoving party is required to go beyond the pleadings "and by [his] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate specific fact showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

### III. WAIVER OF CLAIMS

The Defendant's argue that the complaint in the instant case must be dismissed because the Plaintiff signed a valid and binding waiver of claims.

#### A. *Plaintiff's ADEA Claim*

■ The United States Court of Appeals for the Sixth Circuit has held that "public policy weighs in favor of allowing ... releases of private rights under the ADEA." *Shaheen v. B.F. Goodrich Co.*, 873 F.2d 105, 107 (6th Cir.1989) (citations omitted). In keeping with this principle, the court has formulated a two step review procedure for evaluating the validity of ADEA waiver agreements. *Id.*

First, the court must determine whether the agreement was signed in an atmosphere in which "overreaching or exploitation was not inherent," and whether it was meant to "encourage amicable settlement of honest differences." *Runyan v. National Cash Register Corp.*, 787 F.2d 1039, 1045 (6th Cir.1986) (en banc) (internal quotation marks and citations omitted), *cert.*

*denied*, 479 U.S. 850, 107 S.Ct. 178, 93 L.Ed.2d 114 (1986). Specifically, the reviewing court "should not allow the employers to compromise the underlying policies of the ADEA by taking advantage of a superior bargaining position or by overreaching." *Id.* at 1044–45.

Second, "[i]f 'overreaching or exploitation is not inherent in the situation,' ... [the court should] examine waivers of employee rights under normal contract principles." *Shaheen*, 873 F.2d at 107 (citations omitted). Under such principles, "[p]roperly executed waivers of possible employment-related discrimination claims knowingly and voluntarily made between an employee and his employer will be enforced absent the typical exceptions for fraud, duress, lack of consideration or mutual mistake." *Id.*

Although the court determined to enforce the waivers in *Runyan* and *Shaheen*, both cases are readily distinguishable from the instant action.

In *Runyan* the waiver agreement was signed by a "well-paid, well-educated labor lawyer with many years of experience...." 787 F.2d at 1044. In addition, the agreement was the culmination of months of bargaining in which the threat of an ADEA action played a prominent role. *Id.* at 1040.

In *Shaheen*, the plaintiff was informed prior to her termination that she would be asked to choose between two severance pay plans, the more generous of which included a waiver of claims. 873 F.2d at 106. The plaintiff was given three months to make a decision, and eventually, after consulting with an attorney, chose the plan which included the waiver. *Id.*

■ In the instant action, the facts viewed in the light most favorable to the Plaintiff present a starkly different situation than that present in either *Runyan* or *Shaheen*. Massi alleges that he was told of his termination and presented with the waiver agreement without any prior warning. In addition, he claims that he was pressured to sign the agreement by threats that he would receive no benefits if he

failed to do so. Further, he claims he was pressured to act without the advice of counsel, despite his request to have a copy to take home and review. In his deposition, the Plaintiff described his state of mind as follows:

And after 18 years of service, I felt humiliated. I did not feel comfortable. Then my immediate action in my mind was—I don't know how everybody else lives, but I live from payday to payday, and I had for 18 years. And my immediate thought was, "How the hell am I going to support my family the way my paycheck is going to stop?"

Massi Deposition, at 174.

In light of the facts alleged, the court finds that there are material issues of fact remaining with regard to the validity of the waiver. Specifically, with regard to the first part of the *Shaheen* test, the Plaintiff has presented strong evidence of overreaching and exploitation of superior bargaining power by the Defendant. Accordingly, a grant of summary judgment on the ADEA claim based upon the Plaintiff's alleged waiver is inappropriate.

### B. *Plaintiff's State Law Claims*

■ The Defendant also argues that Plaintiff's state law claims must be dismissed because he signed a binding waiver. In determining the validity of the waiver with regard to the state law claims the court applies the laws of the State of Ohio. *See, e.g., American Druggists' Insurance Company v. Equifax, Inc.,* 505 F.Supp. 66, 68 (S.D.Ohio 1980) (holding that "[i]n Ohio, the validity of a release is to be determined by the law of the place where it is made and is to be performed...").

The facts alleged by the Plaintiff suggest that his signature may have been the result of economic duress. The Supreme Court of Ohio recently explained the standards for proving economic duress under Ohio law. *See Blodgett v. Blodgett,* 49 Ohio St.3d 243, 551 N.E.2d 1249 (1990). Initially, the court noted the long-established proposition that "threats may be held to constitute duress ' * * * if such threats overcome the will of [a] person,

remove his capacity to act for himself and cause him to perform an act he is not legally bound to perform * * *.' " *Id.* at 245, 551 N.E.2d 1249 (quoting *Tallmadge v. Robinson,* 158 Ohio St. 333, 109 N.E.2d 496 (1952)).

The court then described the doctrine of economic duress as follows:

The law of duress as a reason to avoid a contract has evolved to encompass "economic duress" as well as physical compulsion. 1 Restatement of the Law 2d, Contracts (1981), Section 176, Comment a. See, also, *United States v. Bethlehem Steel Corp.* (1942), 315 U.S. 289, 62 S.Ct. 581, 86 L.Ed. 855; *Hartsville Oil Mill v. United States* (1926), 271 U.S. 43, 46 S.Ct. 389, 70 L.Ed. 822 (recognizing economic duress as a legal theory). A person who claims to have been the victim of economic duress must show that he or she was subjected to " * * * a wrongful or unlawful act or threat, * * * " and that it " * * * deprive[d] the victim of his unfettered will." 13 Williston on Contracts (3 Ed.1970) 704, Section 1617. Further, " * * * [m]erely taking advantage of another's financial difficulty is not duress. Rather, the person alleging financial difficulty must allege that it was contributed to or caused by the one accused of coercion." *Id.* at 708. . . .

The United States Court of Claims summarized what a party must prove to establish duress: "[']An examination of the cases * * * makes it clear that three elements are common to all situations where duress has been found to exist. These are: (1) that one side involuntarily accepted the terms of another; (2) that circumstances permitted no other alternative; and (3) *that said circumstances were the result of coercive acts of the opposite party. * * * The assertion of duress must be proven to have been the result of the defendant's conduct and not by the plaintiff's necessities. * * *[']*" (Emphasis added.) *Urban Plumbing & Heating Co. v. United States* (U.S.Ct. of Claims 1969), 408 F.2d 382, 389–390, 187 Ct.Cl. 15, quoting *Fru-*

*hauf Southwest Garment Co. v. United States* (U.S.Ct. of Claims 1953), 111 F.Supp. 945, 951, 126 Ct.Cl. 51.

*Id.,* 49 Ohio St.3d at 245–46, 551 N.E.2d 1249.

In the instant case, the facts viewed in the light most favorable to the Plaintiff present a colorable claim of economic duress. The Plaintiff alleges that unexpectedly he was taken aside and informed that his position was being eliminated. Immediately thereafter he claims he was presented with the waiver agreement, told to review it and informed that he would receive no severance benefits if he chose not to sign. Finally, Plaintiff provided extensive testimony on his confused and disturbed state of mind during this meeting.

These facts, if accepted by the finder of fact, would support a finding of economic duress and the voiding of the agreement. "Whether particular facts are sufficient to constitute duress is a matter of law for the court, while the question of whether the facts alleged actually exist is a matter for the fact finder." *Anselmo v. Manufacturers Life Ins. Co.,* 771 F.2d 417, 419–20 (8th Cir.1985). Accordingly, the presence of unresolved issues of material fact relevant to the question of duress makes a grant of summary judgment inappropriate in this instance.

## IV. PLAINTIFF'S ADEA CLAIM

Initially, it should be noted that Plaintiff has actually advanced two claims in the alternative. He claims both that he was qualified for the job eventually offered to Mary Burkhart and that Burkhart's job was essentially similar to his own. Plaintiff's former claim, however, must obviously be dismissed.

■ In *Wanger v. G.A. Gray Co.,* 872 F.2d 142, 145 (6th Cir.1989), the court considered a terminated employee's claim that he was discriminated against on the basis of his age when his employer failed to rehire him to fill a subsequent opening. In focusing on the issue of whether the employee was required to formally apply for the opening, the court cited *Box v. A & P Tea Co.,* 772 F.2d 1372, 1376 (7th Cir.1985),

*cert. denied,* 478 U.S. 1010, 106 S.Ct. 3311, 92 L.Ed.2d 724 (1986), for the proposition that if an employer "had a formal system of posting job openings and allowing employees to apply for them, [the employee's] failure to apply for [a promotion] would prevent her from establishing a prima facie case." 872 F.2d at 146 (internal quotation marks omitted).

The situation in the instant case is precisely the same as the one described in *Box.* The Plaintiff described Blue Cross' posting system as follows:

> [Open Positions Forms are] posted throughout the company on bulletin boards in various departments at Blue Cross.... Everybody that is interested, they go to the bulletin board, they get a copy, fill out a form, bring it to personnel and then go through the channels.... It's just open to everyone that is interested in that position.

*Massi Deposition,* at 48. When asked if he had applied for the position of financial analyst, however, the Plaintiff responded, "I don't recall. I think I did. I don't recall. The answer is yes or no. I'm not sure." *Id.* In other words, the Plaintiff has failed to make a solid claim that he even applied for the job of financial analyst, and therefore, cannot establish a prima facie case of age discrimination.

Plaintiff's other claim is that his position and Burkhart's were essentially the same, and that, therefore, she replaced him. This claim warrants a more detailed factual analysis. With regard to this claim, the Defendant asserts: (1) the Plaintiff has failed to present a prima facie case; and (2) even if the Plaintiff has presented a prima facie case, he has failed to show that the Defendant's allegedly legitimate reason for the elimination of his job was, in fact, pretextual.

"There is a clearly enunciated rule in this circuit that age discrimination cases are to be decided on a 'case by case basis.' While this circuit allows the use of a modified version of the criteria set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), a

mechanistic application of *McDonnell Douglas* has been explicitly discouraged." *Wanger*, 872 F.2d at 144 (citations omitted).

■ The modified *McDonnell Douglas* test requires the following showing to make a prima facie case:

A plaintiff raises a rebuttable presumption of discrimination by showing (1) he was a member of the protected class, (2) he received adverse employment action, (3) he was qualified, and (4) he was replaced by a younger person.

*Moody v. Pepsi–Cola Metropolitan Bottling Co., Inc.*, 915 F.2d 201, 208 (6th Cir. 1990) (citing *Simpson v. Midland–Ross Corp.*, 823 F.2d 937, 940 (6th Cir.1987)). "The plaintiff can establish a prima facie case of age discrimination by using the *McDonnell Douglas* criteria. The plaintiff can also establish a prima facie case using statistical information, direct evidence of discrimination, and circumstantial evidence other than that which is used in the *McDonnell Douglas* criteria." *Blackwell v. Sun Elec. Corp.*, 696 F.2d 1176, 1180 (6th Cir.1983). Essentially, "a discharged employee presents a prima facie case by introducing evidence that he was adversely affected by the defendant's employment decisions under circumstances which give rise to an inference of unlawful discrimination." *Wanger*, 872 F.2d at 145 (citations and internal quotation marks omitted). The court concludes that the Plaintiff has made a prima facie case. With regard to the *McDonnell Douglas* criteria, there is no dispute that the Plaintiff is a member of the protected class. In addition, inasmuch as his resignation was not voluntary, he was also the subject of an adverse employment action. Further, it has been conceded that three days after the Plaintiff was discharged, a younger employee was transferred to the Provider Finance Contracting Unit. Finally, the court concludes that the Plaintiff has met his burden of production on the issues of whether he was qualified for the job and whether he was replaced by Burkhart.

During his deposition, the Plaintiff was questioned extensively on the similarities and differences between the Financial Research Coordinator position and the Financial Analyst position. Massi Deposition, at 48–51. His testimony described at length how his job had evolved beyond the general description of the Financial Research Coordinator position[5] and had come to resemble the Financial Analyst position. *Id.* at 100–5, 113; *see also id.* at 30–33 (description of Plaintiff's duties).[6]

Apart from the *McDonnell Douglas* criteria, the record also contains additional circumstantial evidence of age discrimination. The Plaintiff has submitted the affidavits of two other former employees within the protected class who had similar termination experiences. *See* Flowers and Wright Affidavits. One of these contained the assertion that Blue Cross was enforcing a general policy of terminating older and more tenure employees. In short, the evidence presented by the Plaintiff was sufficient to meet the burden of persuasion involved in making a prima facie case.

"[I]t is clear, [however,] that merely making out a prima facie case does not automatically save appellant from a summary judgment motion." *Gagné v. Northwestern Nat. Ins. Co.*, 881 F.2d 309, 314 (6th Cir.1989). Once a plaintiff has made a prima facie case, the burden of production shifts to the employer to articulate a legitimate, non-discriminatory reason for the adverse employment decision. *Wooden v. Board of Education of Jefferson County, Kentucky*, 931 F.2d 376, 378 (6th Cir.1991). This in turn shifts the burden of production back to the plaintiff to show that the employer's explanation is pretextual. *Id.* "To meet this standard, [a plaintiff is] required to produce direct, indirect or circumstantial evidence that her age was a factor in the decision to terminate her and that

---

5. For the general descriptions of the Financial Research Coordinator and Financial Analyst exhibits, *see* Massi Deposition, Exhibits 23 and 25.

6. Due to the alleged evolution of his position, the Plaintiff claims that his past work at Blue

Cross satisfies the requirement that a Financial Analyst have a "Graduate business degree (MBA) or CPA *or extensive work experience as a financial analyst.*" Massi Deposition, Defendant's Exhibit 10 (emphasis added).

'but for' this factor she would not have been terminated." *Gagné*, 881 F.2d at 314. The Plaintiff always bears the burden of persuasion. *Wooden*, at 378.

■ The Defendant claims that Plaintiff was discharged because his function, which was geared toward the old retrospective reimbursement plan, had become obsolete. Further, it claims that Burkhart was an expert on the new prospective reimbursement plan. Accordingly, the burden is now on the Plaintiff to produce evidence that shows that the Defendant's stated reason was pretextual. Inasmuch as the burden of production at this stage merges with the burden of persuasion, the Plaintiff must now present sufficient evidence to establish a material issue of fact.

First, it is important to note that both Massi and Burkhart's jobs essentially involved aiding in the process of hospital reimbursement. In attempting to justify the Defendant relies heavily on the shifted focus caused by the switch to the new prospective reimbursement system. Clearly, however, many of the skills employed to administer the old program would also be useful in implementing the new one. In his extended description of his position, Plaintiff alleged involvement in almost all of the tasks involved in a Financial Analyst's job description.

For instance, when Massi was asked whether he had ever helped negotiate financial reimbursements with providers, he responded that he had under the old system, but not under the new system. *Id.* at 50. He stated that he could provide accurate and timely analysis of financial information used to effectively negotiate on a provider-by-provider basis. *Id.* at 190. In addition, the Plaintiff testified that many of the tasks carried out in each job were more team efforts than individual chores. *Id.* at 52. For example, he claimed that as a member of a group he participated in planning and monitoring the prospective reimbursement system, helping to negotiate financial reimbursements for smaller providers, and helping to develop a reimbursement system for physicians.

In addition, the Plaintiff demonstrated a developed understanding of the origins and purposes of the two systems. *Id.* at 49–51, 195. He further testified to knowledge of personal computers and general software applications. *Id.* at 53.

The record also contains extensive evidence to support the Defendant's position. Plaintiff stated that no Blue Cross supervisor ever made any comments to him regarding his age. *Id.* at 116. In addition, at times he seemed to acknowledge that Burkhart's job was separate from his own. *See, e.g., id.* at 199–200. Further, the Defendant presents statistical evidence to rebut claims of a general policy of discharging older employees. *See* Defendant's Motion for Summary Judgment, Exhibits C & D. In addition, it is undisputed that Burkhart held an advanced degree and the Plaintiff did not.

After careful consideration of the evidence presented by both parties, the court concludes, however, that the question of whether age was a determining factor in the decision to discharge the Plaintiff remains an unresolved issue of material fact. Despite the evidence presented by the Defendant, a great deal will turn on who the trier of fact believes with regard to the description of the two jobs. Should the trier of fact determine that the job of Financial Analyst was highly similar to the Plaintiff's job, they might reasonably choose to disregard the Defendant's stated reason for the discharge, especially in light of the alleged circumstances surrounding the signing of the waiver.

Accordingly, the question must be reserved for determination by the trier of fact, and a grant of summary judgment is, therefore, inappropriate.

## V. PLAINTIFF'S STATE LAW CLAIMS

### A. *Plaintiff's Wrongful Discharge Claim*

■ The Defendant claims that Plaintiff's wrongful discharge claim must be dismissed because his employment relationship with the Defendant was at-will, and therefore, terminable with or without cause.

"Unless otherwise agreed, either party to an oral employment-at-will agreement may terminate the employment relationship for any reason which is not contrary to law. This doctrine has been repeatedly followed by most jurisdictions, including Ohio, which has long recognized the right of employers to discharge employees at will." *Mers v. Dispatch Printing Co.*, 19 Ohio St.3d 100, 483 N.E.2d 150, 153 (1985) (citations omitted). "Employment contracts can be terminated at will for any cause, at any time whatsoever, even if done in gross or reckless disregard of any employee's rights." *Phung v. Waste Management, Inc.*, 23 Ohio St.3d 100, 491 N.E.2d 1114, 1116 (1986) (citation and internal quotation marks omitted).

In *Henkel v. Educational Research Council of America*, 45 Ohio St.2d 249, 344 N.E.2d 118 (1976), the Supreme Court of Ohio cited *Forrer v. Sears, Roebuck & Co.*, 36 Wis.2d 388, 393, 153 N.W.2d 587, 589 (1967), for the proposition that there exists "a strong presumption in favor of a contract terminable at will unless the terms of the contract or other circumstances clearly manifest the parties' intent to bind each other."

Along these lines, "[employer handbooks, company policy, and oral representations have been recognized in some situations as comprising components or evidence of the employment contract." *Mers*, 483 N.E.2d at 154 (citing *Hedrick v. Center for Comprehensive Alcoholism Treatment*, 7 Ohio App.3d 211, 454 N.E.2d 1343 (1982); *Helle v. Landmark, Inc.*, 15 Ohio App.3d 1, 472 N.E.2d 765 (1984)).

Plaintiff alleges that the Defendant's representations, conduct, assurances, and the contents of its employee handbook set forth the terms of plaintiff's employment. Plaintiff's Complaint, at ¶ 12. Specifically, Plaintiff claims that the Defendant is contractually prohibited from terminating him without just and sufficient cause. *Id.*

When asked in his deposition what he perceived to be the terms of his employment, the Plaintiff responded:

The employee handbook. That was the term. That's the Bible that I followed.

Not myself individually, but everybody else. That was the guideline.

Massi Deposition, at 142.

A close examination of the employment handbook, however, reveals no statement that qualifies as a contractual offer on the issue of termination conditions. Massi Deposition, Defendant's Exhibit 22. To the contrary, the handbook specifically states:

The Company reserves the right to modify, revoke, suspend, terminate, or change any or all such plans, policies, or procedures, in whole or in part, at any time with or without notice. The language used in this handbook is not intended to create, nor is it construed to constitute a contract between Blue Cross and Blue Shield and any one or all of its employees.

*Id.* at 53. The Plaintiff, therefore, was on notice that the policies stated in the employee handbook were subject to change, and that the handbook itself was not an offer. *See, e.g., Taylor v. National Group of Companies*, 729 F.Supp. 575, 578 (N.D. Ohio 1989) (holding that the plaintiffs had failed to set forth facts sufficient to indicate an implied contract where the employee handbook on which plaintiffs relied contained an express disclaimer that it created no contractual rights); *Pyle v. Ledex, Inc.*, 49 Ohio App.3d 139, 551 N.E.2d 205, 211 (1988) (holding a similar disclaimer effective to preclude the formation of an implied contract even though the clause was added to the employment manual 20 years after the plaintiff was first hired); *Uebelacker v. Cincom Systems, Inc.*, 48 Ohio App.3d 268, 549 N.E.2d 1210, 1216–17 (1988) (holding that a similar disclaimer "clearly manifests [the employer's] intent not to be contractually bound by the policy statements and procedures contained in its benefit book[,]" and that, therefore, "no issues of fact remain as to whether an express or implied obligation to discharge only for just cause arose under the policies and procedures set forth in [the] benefit book ..."); *Saini v. Cleveland Pneumatic Co.*, No. 51913, slip op., 1987 WL 11098 (Ohio Court of Appeals, Cuyahoga County May 14, 1987) (holding that in light of a similar disclaimer, "the

appellant had no right to rely on the provisions of the Manual as though they constituted contract terms[,]" and that "[t]he trial court properly granted summary judgment for the appellee on the ground that the Manual did not constitute an implied contract guaranteeing job security except for just cause.").

Plaintiff seems to recognize as much in his Brief in Opposition to Defendant's Motion for Summary Judgment, and shifts his focus to certain statements allegedly made by Blue Cross executives. Specifically, Plaintiff cites a September 17, 1985 letter from a Blue Cross vice president which congratulates him on eighteen years of service and closes by stating, "... I look forward to working with you in the future." Further, the Plaintiff cited speeches made by Blue Cross' President in which he expressed his gratitude to the employees and discussed the importance of a team effort. Finally, the Plaintiff presented some sketchy testimony to the effect that his supervisors had told him that his position was secure as long as he performed satisfactorily. Massi Deposition, at 161–166.

In discussing the Ohio law concerning contract modifications to at-will employment contracts, the Plaintiff relies heavily on *Bolling v. Clevepak Corp.*, 20 Ohio App.3d 113, 484 N.E.2d 1367 (1984). The *Bolling* case relies heavily upon the court's holding in *Helle* that "[w]hen ... oral or written modifications of the original employment contract satisfy the paradigm elements essential to contract formation—*i.e.*, offer, acceptance, consideration—binding obligations arise." 472 N.E.2d at 773. Both *Bolling* and *Helle* are readily distinguishable from the instant case,[7] and even if they weren't, the evidence presented by the Plaintiff fails to create an issue of material fact on the question of whether there has been an implied contractual modification of the at-will relationship. Quite

simply, the facts alleged do not support the conclusion that there has been a meeting of the minds on the issue of termination conditions.

The court is aware of the Supreme Court of Ohio's warnings in *Mers* and *Kelly v. Georgia–Pacific Corporation*, 46 Ohio St.3d 134, 545 N.E.2d 1244, 1250 (1989), that claims of implied contract are generally not susceptible to resolution by summary judgment. In the instant case, however, even if the trier of fact considered the Employment Manual and accepted the Plaintiff's assertions about statements made to him by Blue Cross executives, it would still have to conclude that no implied contractual modifications to the at-will relationship could reasonably be found to have arisen.

B. *Plaintiff's Promissory Estoppel Claim*

■ In the third count of his complaint, the Plaintiff alleges that the Defendant was barred from discharging him without cause by the doctrine of promissory estoppel.

Under the doctrine of promissory estoppel, "a promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise." *Mers*, 483 N.E.2d at 154 (citations omitted). In *Mers*, the court held that the doctrine of promissory estoppel is applicable to employment-at-will agreements, and that "[t]he test in such cases is whether the employer should have reasonably expected its representations to be relied upon by its employee and, if so, whether the expected action or forbearance actually resulted and was detrimental to the employee." *Id.* 483 N.E.2d at 155.

---

7. Both cases deal with a company's obligation to pay severance benefits as described in company policies. As the court noted in *Helle*, its holding depended largely on the fact that "this case does *not* involve the characteristic dispute over termination, usually the focal point of litigation under the employment-at-will doctrine." 472 N.E.2d at 772 (citing, *inter alia, Henkel v. Edu-*

*cational Research Council*, 45 Ohio St.2d 249, 344 N.E.2d 118 (1976)). The court further stated that "[t]his case, by contrast, arises from [the defendant's] refusal to pay severance benefits, ... and thus *the issue presently before us* entails an analysis based upon *contemporary contract theory.*" *Id.* (emphasis added).

In asserting his claim of promissory estoppel, the Plaintiff relies on the same evidence presented in support of his breach of employment contract claim. To a large extent, the evidence is equally ineffective in this context. The Employment Manual, for instance, contained no unambiguous promises, and, in fact, contained a disclaimer which specifically tried to deter reliance. In addition, the Plaintiff fails to raise an issue of material fact by stringing together a handful of vague statements by company executives.

Plaintiff's claim that his supervisors made assurances regarding his job security, however, raise the issue of the Plaintiff's credibility. The questioning on this issue went as follows:

Q I want to know everybody at Blue Cross who told you, "Mr. Massi, your employment will continue for as long as you do a good job"?

A Yes. Robert Wright, my previous supervisor. John Swift.

&ast; &ast; &ast; &ast; &ast; &ast;

Q [Robert Wright] expressly said your employment—

A "You're doing a good job. You're not only rewarded with another year's work, but also you can get an increase in your pay."

Q And that is all he said?

A That's right.

Q He didn't say, "Mr. Massi, your employment will continue in the future for as long as you do a good job"?

A Yes, he said that, too.

&ast; &ast; &ast; &ast; &ast; &ast;

Q Other than your length of service, your salary increases, which apparently created the impression in your mind that your employment would continue for as long as you performed satisfactorily, ... did Mr. Wright ever explicitly state to you, "Mr. Massi" or "Lou, your employ-

ment will continue for as long as you do a good job or a satisfactory job"?

A The answer is yes. . . .

Massi Deposition, at 162–65.

Viewing the facts set forth in the light most favorable to the Plaintiff, the court concludes that issues of fact remain as to: (1) whether Plaintiff's supervisors actually made the alleged statements; (2) whether the Defendant reasonably should have foreseen that the assurances would be relied upon by the Plaintiff; (3) whether the Plaintiff's reliance was reasonable; and (4) whether the Plaintiff's reliance was to his detriment.[8] Accordingly, summary judgment is not appropriate with regard to Count 3.

## VI. CONCLUSION

Defendants motion for summary judgment is DENIED with regard to Counts 1 and 3, and GRANTED with regard to Count 2. Accordingly, Counts 2 is DISMISSED.

IT IS SO ORDERED.

---

**8.** The Plaintiff comes precariously close to presenting insufficient evidence to support his claim of detrimental reliance. His claim that he turned down a job that would have provided better benefits, however, is unrebutted and entitles him to take his case to the trier of fact. *See* Massi Deposition, at 168–69.