James T. SPRADLING, James Armstead and Ralph Page, Plaintiffs,

v.

Burl C. BLACKBURN, former employee of Sears, Roebuck and Co., and Sears, Roebuck and Co., Defendants.

Civil Action No. 2:95–0265.

United States District Court, S.D. West Virginia, Charleston Division.

April 2, 1996.

**970**

Patrick L. Cottrell, Steven L. Miller Law Offices, Cross Lanes, WV, for plaintiffs.

Anita R. Casey, Meyer, Darragh, Buckler, Bebenek & Eck, Charleston, WV, Joe C. Ashworth and Susan Brahm Gunn, Jackson, Lewis, Schnitzler & Krupman, Pittsburgh, PA, for defendants.

### MEMORANDUM OPINION AND ORDER

HADEN, Chief Judge.

Pending is Defendants' motion for summary judgment. For the reasons set forth below, Defendants' motion is **GRANTED**.[1]

### I. FACTUAL DEVELOPMENT

Plaintiffs James T. Spradling, James Armstead and Ralph Page are all over fifty years of age. Spradling commenced work with Defendant Sears, Roebuck & Company (Sears) on July 28, 1969. Armstead began working for Sears on August 29, 1956. Page started with Sears in August 1965. Plaintiffs have the equivalent of a ninth-grade education.

Throughout the country Sears operates retail stores and automotive centers, which are separate lines of business. Plaintiffs were employed at the Sears automotive center in Charleston, West Virginia. There were a total of fifty associates employed at the auto center at the end of 1992. Included among these fifty associates were seven full-time mechanics. Each Plaintiff occupied one of the full-time positions. The remaining four mechanics were (1) Paul Huffman (age 60); (2) David Woodall (age 34); (3) Russell Barker (age 39); and (4) Burt Huffman (age 48).

---

1. The Court notes initially Plaintiffs' response brief contains no citations to, nor explanations of, its voluminous attached exhibits. Further, some of the documents are duplicated. While the Court has reviewed each page of the exhibits tendered by Plaintiffs, the review is hampered by an inability to divine what some of the documents are or what they represent. In the future, parties are strongly encouraged (1) to provide specific citation to the record for. factual assertions in their briefs; and (2) to give the Court some indication as to the nature of the exhibits and their relevance.

Defendant Burl C. Blackburn was the auto center manager and Plaintiffs' supervisor for over thirteen years. He retired in April 1993. The assistant auto center manager was James Epperley II.

As early as 1988, consistent with Sears attempts to improve the level of service at its auto centers, Blackburn began encouraging his mechanics to achieve certification through the Automotive Service Excellence Program ("ASE"). ASE certification is a national distinction within the automotive service industry and requires the successful completion of an examination. The mechanics were encouraged to obtain certification in either brakes or front-end alignment. Blackburn and Epperley attempted to facilitate the certification requests with offers of books, manuals and classes.

As a result of reduced profitability and a desire to enhance its reputation, Sears asserts it decided to reorganize and restructure its auto centers nationwide. Sears freely admits one of its goals was to reduce its workforce.[2] On January 27, 1993 Sears issued a directive to store general managers and auto center managers describing the steps necessary to implement the reorganization by March 1993.

To facilitate the reduction-in-force, a voluntary separation/early retirement option (the "package") was offered to auto center employees, including the full-time mechanics based in Charleston. Blackburn was directed to retain only five full-time "automotive technicians," a new position which replaced

the "mechanic" designation. Sears required that each of the five technicians retained (1) have at least one ASE certification, preferably in brakes or front-end alignment; and (2) achieve a second certification by the end of 1993.[3] This new policy was announced to the Charleston auto center employees in late 1992. In late February 1993, Blackburn and Epperley met individually with the full-time mechanics and explained the reorganization more fully.

Plaintiffs Armstead and Spradling had no ASE certifications and Plaintiff Page was certified for brakes only. Given their lack of certifications, Blackburn told Armstead and Spradling there would no longer be a position available for them. Given Page was certified in brakes, he was offered an automotive technician position on condition he achieved his remaining certification by the end of 1993. Despite Blackburn's encouragement, Page refused the position and, along with Armstead and Spradling, accepted the package in March 1993.[4] Plaintiff Spradling, at least, requested placement in another position at Sears, but he was not offered an alternate job. In their response brief, unsupported by citation to the record, Plaintiffs assert other, younger individuals were given alternate positions.

The retirement package was entitled "Closed Unit Reorganization Package for Time Care Regular Associates." It was given to each Plaintiff by Blackburn during individual meetings with them. The package

---

2. The reorganization ultimately resulted in a thirty per cent reduction in the number of employees at its auto centers. At the Charleston auto center, the staff was reduced from forty-three employees at the end of 1992 to thirty-four at the end of 1994.

3. The requirement for a second certification was eliminated in July 1993 and no mention of it is made in the position description for the automotive technician job. Neither of the parties give any significant explanation for the discrepancy. The Court did locate in Plaintiffs' exhibits a one-page unsworn signed statement from several Sears employees that sheds some light on the issue. The statement avers that when the discrepancy was brought to Blackburn's attention he stated, regardless of what the paper provided, both certifications had to be achieved by the end of the year.

4. Page does not dispute that the day after he accepted the package, Blackburn "encourage[d] Page to think about it again and ... to rip up the [agreement] if he did not want to leave Sears." Blackburn aff. at ¶ 31.

In addition to Plaintiffs, four other individuals employed at the auto center accepted the package: (1) Becky Phillips (age 37); (2) Clifton McClure (age 38); (3) Amanda Cameron (age 56); and Donald Schmidt (age 53). Of the other full-time mechanics who became automotive technicians at the auto center after the reorganization, four were ASE-certified in both brakes and front-end alignment and one, David Woodall (age 34), was certified for front-end alignment only.

included information on pension considerations, a summary plan description of the severance allowance plan, notification as to employee rights under the plan, an associate interview form, and a General Release and Waiver (the "Release") and accompanying forms.

Apparently after discussing some of these matters with Blackburn, each Plaintiff signed the associate interview form, which discussed (1) the employee's eligibility for Sears retirement plans, (2) the availability of a leave of absence for up to one year to maximize retirement benefits; and (3) the continuation of health care coverage.

In exchange for accepting the package, Plaintiffs received early retirement and severance benefits. In addition to their retirement and other benefits, Spradling was paid $7,002.41, Armstead $10,109.28 and Page $10,783.43 in severance benefits. Plaintiffs maintain in their brief that Blackburn told them they would receive no money from Sears, or that their money would be held up, if they refused to accept the package.[5]

In exchange for the severance benefits, all three Plaintiffs signed the Release, which provided as follows:

In consideration of the benefits I will receive under the Sears Closed Unit/Reorganization Severance Allowance Plan as described in the attached Benefit Notification form, I [Plaintiff's name], hereby release, waive, and forever discharge Sears, Roebuck and Company, its agents, subsidiaries, employees, officers, successors, and assigns from any and all actions, causes of action (INCLUDING, BUT NOT LIMITED TO, ACTIONS UNDER TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, THE AGE DISCRIMINATION IN EMPLOYMENT ACT, STATE CIVIL RIGHTS STATUTES, AND THE AMERICANS WITH DISABILITIES ACT), damages or claims of damage of every

character whatsoever by reason of my employment with Sears, whether known or hereafter discovered, including, but not limited to, my termination from Sears.

I have read this General Release and Waiver and understand all of its terms. I have signed it voluntarily with full knowledge of its legal significance. I have been given the opportunity to consult with an attorney but have chosen not to do so.

The forms were not signed in an information-free vacuum. On the very first page of the package, next to the bold, highlighted word "Important," the following notice appears:

If you elect to accept the package, you will be required to sign … [the Release].

Various State and Federal laws prohibit employment discrimination based on age, sex, race, color, national origin, religion, disability or handicap, or veteran status. These laws are enforced through the Equal Employment Opportunity Commission (EEOC), Department of Labor, and various state agencies. If you feel that your election to receive the Sears Closed Unit/Reorganization package is coerced or discriminatory, you are encouraged to speak with your Human Resource Manager.

There is an IMPORTANT NOTICE attached to this booklet which outlines your rights under the Older Workers Benefit Protection Act. Please read the Notice carefully before signing the [Release].

You may also want to discuss the language contained in the [Release] with your lawyer. In any event, you should thoroughly review and understand the effect of the [Release] before acting on it. Therefore, please take the Release home and consider it before you decide to sign it.

The "IMPORTANT NOTICE" provided to Plaintiffs stated, in pertinent part, as follows:

---

5. Plaintiffs also baldly assert
[t]he consideration paid by Sears in exchange for the execution of the releases was consideration which the plaintiffs would have otherwise been legally entitled to receive by virtue of their long employment histories with Sears, during which they were all enrolled in the Defendant's retirement plan. It also constitut-

ed consideration which the plaintiffs would have been legally entitled to receive by virtue of their lay offs from their employment with Sears.

Pls.' resp. at 12. Again, Plaintiffs provide no citation to the record for this proposition, and the Court has located none.

Payment of Severance Allowance Plan benefits is contingent upon your signing [the Release]. Before you sign the [Release] it is important that you read and understand the following information:

* You have up to 45 days from the date you receive this Notice to consider whether or not you wish to sign the [Release].

* If you sign the [Release], you then have up to 7 days to change your mind and revoke the [Release].

* Attached to this Notice is a listing of Job Titles and birthdates of incumbents within your organization or job classification who have been offered Sears Closed Unit/Reorganization Severance Allowance Plan benefits.

If applicable, also attached is a listing of Job Titles and birthdates of incumbents within your organization or job classification who were not offered Sears Closed Unit/Reorganization Severance Allowance Plan benefits. This list does not include those not eligible to receive an offer of benefits as defined in the Summary Plan Descriptions 555 and 556. (Part-time and part-time regular employees are an example of those not eligible for an offer of Severance Allowance Plan benefits.) The attached Summary Plan Description describes the eligibility requirements.[6]

* Within your organization, Sears Closed Unit/Reorganization Severance Allowance Plan benefits were offered to:

THOSE AUTOMOTIVE CENTER ASSOCIATES WHOSE POSITION HAS BEEN ELIMINATED OR WHOSE INCOME HAS BEEN ADVERSELY AFFECTED

* By signing the [Release], you should understand that you are not waiving any rights which might arise in the future.

(footnote added).

Page stated he met with Blackburn three times about the package and received an explanation of the materials. Page read the Release before signing it and admitted taking the documents home and reading them over. He knew of his right to revoke acceptance within seven days and admits he was not threatened or coerced into signing the Release.[7] He asserted it was his decision to sign the Release and that he never attempted nor wanted to phone a lawyer.[8] A family friend familiar with benefits was drafted by Page's daughter to look over the materials and appears to have provided some advice on the package. Armstead testified Blackburn explained details of the package to him and gave him the package approximately two weeks before he was to sign the Release. He also admits to reading portions of the package and to Blackburn's admonishment to him that he take the package home, read it and discuss it with his wife. He admits Blackburn was not intimidating and appears to agree the two simply carried on a civil conversation about the package. He was aware of the seven-day revocation provision and was also aware of the provision encouraging him to seek legal advice if he thought appropriate. He declined to seek such advice nevertheless. He further admits freely he knew he was giving up his right to sue Sears by signing the Release.[9] Significantly, Sears told Armstead it would not contest his attempts to seek unemployment compensation. This amounted to $8,000 in compensa-

6. The listing referred to in this asterisked section are not attached to the parties exhibits. Plaintiffs do not dispute in their response brief, however, that they received these documents.

7. Page and his fellow Plaintiffs testified that while they were entitled to forty-five days to consider the package pursuant to the notice, they actually had only two weeks, given their date of termination and Blackburn's stated deadline to return the materials.

8. In not retaining attorneys, Plaintiffs expressed some concern about the cost of doing such. In their response brief, they also complain they lacked sufficient time to secure a consultation. They do not assert, however, they attempted contact with counsel but were unable to do so because of time constraints.

9. This statement from Mr. Armstead directly contradicts his attorney's assertion that Armstead "did not understand the legal effect of the release...." Pls.' Resp. at 10.

tion in addition to his severance benefits. Armstead further testified he had "rental places ... [and] stocks and stuff like that." Armstead Dep. at 78–79.

Spradling took the package home and went over portions with his wife.[10] He admits he was aware of the seven-day revocation provision and his right to consult an attorney. He chose not to do so. He too agreed he was not overtly pressured into accepting the package and conceded Blackburn "was very kind" to him during their meeting. Nevertheless, Spradling stated at the time of signing the Release that he was doing so under duress. As for his reading ability, he stated his comprehension was "pretty good." Spradling dep. at 192.

Plaintiffs assert they were discouraged by Epperley from obtaining advice about retirement options from a Sears employee specializing in such because she was too busy. They also assert that on their last day of work, Epperley brought three younger men into the store to work in the auto center. Based on these and other allegedly discriminatory actions, Plaintiffs filed a complaint March 3, 1995 alleging age discrimination pursuant to the West Virginia Human Rights Act, *West Virginia Code* § 5–11–1 to –19 (Human Rights Act).

## II. LAW AND ANALYSIS

### A. *The Summary Judgment Standard:*

 The well-settled standard governing the disposition of a motion for summary judgment recently was restated by our Court of Appeals:

> A moving party is entitled to summary judgment 'if the pleading[s], depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to material fact and that the moving party is entitled to judgment as a matter of law.'

Fed.R.Civ.Pro. 56(c). *See Charbonnages de France v. Smith,* 597 F.2d 406 (4th Cir.1979).

A genuine issue exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.' *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). In considering a motion for summary judgment, the court is required to view the facts and draw reasonable inferences in a light most favorable to the nonmoving party. *Id.* at 255, 106 S.Ct. at 2514. The plaintiff is entitled to have the credibility of all his evidence presumed. *Miller v. Leathers,* 913 F.2d 1085, 1087 (4th Cir.1990), *cert. denied,* 498 U.S. 1109, 111 S.Ct. 1018, 112 L.Ed.2d 1100 (1991). The party seeking summary judgment has the initial burden to show absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). The opposing party must demonstrate that a triable issue of fact exists; he may not rest upon mere allegations or denials. *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. A mere scintilla of evidence supporting the case is insufficient. *Id.*

*Shaw v. Stroud,* 13 F.3d 791, 798 (4th Cir.), *cert. denied,* —— U.S. ——, ——, 115 S.Ct. 67, 68, 130 L.Ed.2d 24 (1994); *see also McDonald v. Cabot Corp.,* 914 F.Supp. 1356 (S.D.W.Va.1996). Accordingly, it is through this analytical prism the Court evaluates Defendants' motion.

### B. *Claims Against Burl C. Blackburn:*

The Court notes initially the absence of a return of service of process as to Defendant Blackburn. Pursuant to *Rule* 4(m), *Federal Rules of Civil Procedure,* and general jurisdictional principles, any causes of action pending against Defendant Blackburn are DISMISSED.[11]

---

**10.** It appears from his deposition testimony that Mr. Spradling originally asserted he was not given the whole package, but rather just a portion of it. Plaintiffs now appear to concede Spradling received the document in its entirety. *See* Pls.' Resp. at 3 (stating "The written materials relating to the early retirement package were distributed to the plaintiffs in late February 1993.")

**11.** While dismissal pursuant to *Rule* 4(m) is typically without prejudice, the Court's analysis with respect to Sears' motion for summary judgment would apply with equal force to the claim asserted against Defendant Blackburn individually.

## C. The Validity of the Waivers Signed by Plaintiffs:

Before reaching the shifting-burdens analysis for Plaintiffs discrimination claims, the Court must first determine whether Plaintiffs released their claims under the Human Rights Act. Although neither are mentioned by the parties, there is both regulatory and decisional precedent in West Virginia suggesting such releases are valid.[12] In *West Virginia Human Rights Commission v. Moore,* 186 W.Va. 183, 411 S.E.2d 702 (1991), a circuit court quashed a subpoena duces tecum issued to an employer by the Human Rights Commission because the complainant/employee had signed, at the time of his termination, a release waiving all claims against the employer arising out of the employment relationship. While the Supreme Court of Appeals did not address whether such a waiver is valid, it clearly intimated such. For instance, the Court stated "whether or not the release *was valid, that is, knowingly and voluntarily signed,* is an issue which is in dispute...." *Id.* at 186, 411 S.E.2d at 705 (emphasis added).

Further, the Supreme Court of Appeals noted the Human Rights Commission had promulgated proposed legislative rules allowing agreements waiving rights under the Act under certain circumstances. *Id.* at 188 n. 9, 411 S.E.2d at 707 n. 9. Had the court wanted to preempt these permissive regulations, it clearly could have given some indication it considered them invalid. Instead, the court merely noted the regulations were not effective at the date of the decision. *Id.*

The proposed regulations discussed by the *Moore* court are now in effect and have been since April 29, 1992. While the regulations do not control the validity of the waiver in this case,[13] they are a strong indication that a release of claims under the Human Rights Act is not contrary to West Virginia public policy.[14] Accordingly, the Court concludes a plaintiff may knowingly and voluntarily waive his rights under the Human Rights Act.

While Plaintiffs do not seriously question this proposition, they appear to assert the Releases were not signed in a knowing and voluntary manner. Specifically, Plaintiffs complain of (1) the lack of any negotiation between them and Sears about the terms of the Release; (2) the presentation of the Releases in "ultimatum" fashion; (3) an inability to pay their bills if they failed to sign; and (4) insufficient time to consider the Releases.[15] None of these arguments are

---

Accordingly, based on the analysis which follows below, all claims against Defendant Blackburn are dismissed with prejudice.

12. Plaintiffs appear to make a brief argument that the releases are "void as against the strong public policy contained in both state and federal statutes outlawing age discrimination...." As amply demonstrated below, Plaintiffs' blanket assertion is erroneous.

13. Title 77 W.Va. C.S.R. § 77–6–1.1 defines the scope of the waiver regulations as follows:

Scope.—The following legislative regulations of the [Human Rights Act], W.Va. Code § 5–11–1 et seq., set forth criteria for regulating the voluntary release or waiver of an individual's right to pursue a claim *before the West Virginia Human Rights Commission.*

*Id.* (emphasis added); *see also id.* § 77–6–1.2 (stating "No waiver agreement may be used to justify interference with the right of an individual to file a complaint or participate *in any proceeding conducted by this Commission.*") (emphasis added). The regulations, by their own terms, do not have any effect on the validity of a waiver when a plaintiff opts to file suit in the first instance in a West Virginia circuit court. The

Plaintiffs chose to do so here and never filed a charge of discrimination with the Human Rights Commission. Accordingly, the regulations are not binding on the Court. In any event, the Court would note the Release signed by Plaintiffs' substantially complies with the regulatory requirements.

14. This is likewise true under the ADEA. Title 29 U.S.C. § 626(f) contains a laundry list of requirements for a waiver of ADEA rights to be considered knowing and voluntary.

15. Plaintiffs assert that absent their assent to the Releases "they would not [have] receive[ed] any money from Sears and their monthly bills would [have gone] unpaid." Pls.' Resp. at 10.

Plaintiffs also complain that while the documents provided they were entitled to forty-five days to consider the releases, they in actuality had only "two weeks" to do so. Pls.' resp. at 10. This argument fails as a matter of law. *See, e.g., White v. General Motors Corp.,* 908 F.2d 669, 672 (10th Cir.1990) (suggesting fourteen days to retain attorney and consider releases was reasonable and noncoercive as a matter of law), *cert. denied,* 498 U.S. 1069, 111 S.Ct. 788, 112

well-taken.[16] The third argument though, which appears to be based on the doctrine of economic duress, bears a thorough discussion.

■ "[I]t is generally accepted that if a party makes a compromise as a result of duress, he may have the compromise invalidated." Jay M. Zitter, Annotation, *What Constitutes Duress by Employer or Former Employer Vitiating Employee's Release of Employer From Claims Arising Out of Employment*, 30 A.L.R. 4th 294, 296–97 (1984). Economic duress is a variant on the common-law doctrine of duress.

The Supreme Court of Appeals discussed economic duress at length in *Machinery Hauling, Inc. v. Steel of West Virginia*, 181 W.Va. 694, 384 S.E.2d 139 (1989). In *Steel*'s lone syllabus point, the court held as follows:

> The concept of 'economic or business duress' may be generally stated as follows: Where the plaintiff *is forced into a transaction as a result of unlawful threats or wrongful, oppressive, or unconscionable conduct* on the part of the defendant which *leaves the plaintiff no reasonable alternative but to acquiesce,* the plaintiff may void

the transaction and recover any economic loss.

*Id.* at 695, 384 S.E.2d at 140 (emphasis added); *see Brock v. Entre Computer Centers, Inc.*, 933 F.2d 1253, 1260 (4th Cir.1991) (stating a party asserting economic duress "must establish 'that a wrongful threat was made which was of such character as to destroy the free agency of the party to whom the threat was directed.' ") (quoted authority omitted).[17] The Supreme Court of Appeals went on to state "there appears to be general acknowledgement that duress is not shown because ... financial circumstances may have caused one party to make concessions." *Steel*, 181 W.Va. at 699, 384 S.E.2d at 144;[18] *see also Holland v. High–Tech Collieries, Inc.*, 911 F.Supp. 1021, 1037 (N.D.W.Va.1996) (applying West Virginia law and stating "the fact that one enters into an agreement because of a need for money at the time does not constitute duress sufficient to avoid the contract.").

There is a split of authority concerning whether economic duress is shown by a plaintiff's precarious financial condition. Many courts suggest the difficult choice of taking money in return for executing an em-

---

L.Ed.2d 850 (1991). Much shorter periods of time have been upheld as reasonable. Further, the time factor alone cannot be considered dispositive in determining whether the releases were executed in knowing and voluntary fashion.

On a related note, Plaintiffs assert two weeks was insufficient time to consult with an attorney. Plaintiffs have not given any indication in their briefing, however, that they were interested in such a consultation. Further, the assertion is belied by the fact Page timely sought counsel from a lay person through his daughter about the advisability of entering into the severance agreement. Contrary to their after-the-fact suppositions, the record discloses Plaintiffs had no interest in seeking the advice of counsel when they were considering the Releases.

16. Plaintiffs do not specifically argue fraud in the execution of the Releases, but the cases they cite do contain references to such as a possible ground for voiding a release. Given the lack of such an argument though, and the failure to aver fraud with particularity in the complaint pursuant to *Rule* 9(b), *Federal Rules of Civil Procedure,* the Court does not reach the issue.

17. *Steel* involved a defendant who threatened to terminate its relationship with a plaintiff hauling company. The loss of business to the hauling

company would have amounted to over one million dollars ($1,000,000) per year. Though *Steel* did not involve an employment relationship, there is no indication the elements for economic duress would be any different in such a case. In fact, the opposite is true. One of the cited authorities for the *Steel* Syllabus Point was the annotation cited by this Court above dealing with releases and duress in the employment context. *Steel*, 181 W.Va. at 697–98, 384 S.E.2d at 142–43.

18. In making this statement, however, the West Virginia Court acknowledged there may be extraordinary cases that justify submission of the financial circumstances question to the jury. The court specifically referred to the decision in *Totem Marine Tug & Barge, Inc. v. Alyeska Pipeline Service Co.*, 584 P.2d 15 (Alaska 1978). In *Totem,* defendant owed plaintiff, a small delivery company, over one-quarter-of-a-million dollars and delayed payment on the obligation until plaintiff was in dire financial straits. In full settlement of the amount owed, Defendant then offered to pay plaintiff less than one hundred thousand dollars, which plaintiff accepted to avoid bankruptcy. The Alaska court held there was a genuine issue of material fact as to whether the settlement was coerced. The Court has no difficulty distinguishing the nefarious pressure in *Totem* from Sears behavior in the instant case.

ployer's release or taking one's chances in court and financially, does not amount to economic duress often. Illustratively, see: *Johnson v. International Business Machines Corp.*, 891 F.Supp. 522, 530 (N.D.Cal.1995) (stating the ability to rely on available lines of credit and economize on discretionary expenditures are valid considerations in determining whether economic duress is present); *Burch v. Fluor Corp.*, 867 F.Supp. 873, 878 (E.D.Mo.1994) (stating a claim of economic duress cannot succeed where there is " 'knowledge of the facts and opportunity for investigation, deliberation and reflection.' ") (quoted authority omitted); *Joseph v. Chase Manhattan Bank, N.A.*, 751 F.Supp. 31, 36 (E.D.N.Y.1990) (stating "difficult choices [arising out of the employment relationship] do not constitute duress."); *Constant v. Continental Tele. Co. of Ill.*, 745 F.Supp. 1374, 1384 (C.D.Ill.1990) (upholding release and stating "economic pressure is always present when someone is offered a large sum of money [$22,000] for a release."); *Reed v. SmithKline Beckman Corp.*, 569 F.Supp. 672, 675 (E.D.Pa.1983) (stating " 'Duress is not established merely by showing that the release was given under pressure of the financial circumstances.' ") (quoted authority omitted); *Zeilinger v. SOHIO Alaska Petroleum Co.*, 823 P.2d 653, 658 (Alaska 1992) (stating "quite simply, economic necessity—very often the primary motivation for compromise—is not enough, by itself, to void an otherwise valid release."); *Horgan v. Industrial Design Corp.*, 657 P.2d 751, 753–54 (Utah 1982) (upholding release and stating "Many releases are negotiated and signed out of economic necessity; to adopt plaintiff's argument would therefore invite the avoidance of many good faith settlements.").

Other courts more readily find the presence of economic duress, or at least a jury question, under such circumstances. *See, e.g., Massi v. Blue Cross & Blue Shield Mut. of Ohio*, 765 F.Supp. 904, 909–10 (N.D.Ohio 1991) (suggesting plaintiff's asserted inability to pay bills coupled with unexpected announcement of termination and other factors could create triable issue on economic duress); *Maust v. Bank One Columbus, N.A.*, 83 Ohio App.3d 103, 614 N.E.2d 765, 769 (1992) (stating threats of employer to plaintiff "to come after [plaintiff] and ruin him financially" created genuine issue of material fact on economic duress), *jurisdictional motion overruled by* 66 Ohio St.3d 1488, 612 N.E.2d 1244 (1993).

■ The Court's choice between these two alternative lines of authority is clear-cut for at least two reasons. First, as stated by the Supreme Court of Appeals in *Steel,* "there appears to be general acknowledgement that duress is not shown because ... financial circumstances may have caused one party to make concessions." *Steel,* 181 W.Va. at 699, 384 S.E.2d at 144. Plaintiffs' duress argument is thus very difficult to maintain based simply on their alleged inability, absent agreement to the terms of the package, to satisfy current financial obligations.

Second, and most important, Plaintiffs allegations are just that—allegations. While they suggest they were under the press of financial distress, they offer little if any evidence concerning their available credit lines, alternate sources of income, or the amount or existence of pending obligations. Only generalizations appear. Where the Court has located specific discussion concerning these matters, they contradict Plaintiffs' generalizations. For instance, Plaintiff Armstead indicates he began drawing unemployment and proceeded to draw $8,000.00 of such without objection from Sears in addition to the thousands of dollars he received in severance benefits. Armstead even alluded to his "rental places ... [and] stocks and stuff like that." Armstead Dep. at 78–79.

■ Based on these and other considerations, the Court concludes as a matter of law Plaintiffs cannot demonstrate economic duress. Plaintiffs' remaining arguments are equally unavailing and insufficient to forestall the conclusion Plaintiffs executed the Releases in knowing and voluntary fashion.[19] Ac-

---

19. Plaintiffs rely exclusively on *Coventry v. U.S. Steel Corp.*, 856 F.2d 514 (3d Cir.1988), to demonstrate the Releases were not entered in a

knowing and voluntary fashion. In that case, however, the court applied the *"more stringent federal 'totality of the circumstances' "* test to

cordingly, Sears motion for summary judgment is **GRANTED.**

### III. CONCLUSION

Based on the foregoing, the Court concludes there exists no genuine issue of material fact and that Defendants are entitled to judgment as a matter of law. Accordingly, Defendants' motion for summary judgment is **GRANTED** and this case is **DISMISSED WITH PREJUDICE** and stricken from the docket of the Court.

judge the validity of the waiver. *O'Shea v. Commercial Credit Corp.*, 930 F.2d 358, 361 (4th Cir.), *cert. denied*, 502 U.S. 859, 112 S.Ct. 177, 116 L.Ed.2d 139 (1991) (emphasis added). The Fourth Circuit's approach would appear to be more in line with what the Court anticipates the West Virginia approach to be. In *O'Shea*, the Fourth Circuit opted for the other side of the then-split circuits on the issue and applied the less stringent ordinary-contract-principles test to assess the release. The circuit split has now essentially been resolved by Congress via the enactment of 29 U.S.C. § 626(f). *See supra* n. 14; 5 Lex K. Larson, *Employment Discrimination* § 102.50 (2d ed. 1995). By enacting § 626(f), "Congress essentially codified the 'totality of the circumstances' test." *Blistein v. St. John's College*, 74 F.3d 1459, 1465 (4th Cir. 1996).

Even assuming Plaintiffs could demonstrate duress or invalidity, the releases would merely be voidable. *See Machinery Hauling, Inc.*, syl. pt., 181 W.Va. at 695, 384 S.E.2d at 140; *Carroll v. Fetty*, 121 W.Va. 215, 222, 2 S.E.2d 521, 524–25, *cert. denied*, 308 U.S. 571, 60 S.Ct. 85, 84 L.Ed. 479 (1939); 6B *Michies Jurisprudence* § 3 (1985); *see also Blistein*, 74 F.3d at 1466. Accordingly, Plaintiffs are subject to the general rule that "[w]hen an employee seeks to rescind a [voidable] release, he or she is required to tender back any consideration received [before being permitted to challenge the release]." Henry H. Perritt, Jr., *Employee Dismissal Law and Practice* § 8.10 (3rd ed. 1992).

The Court also expresses doubt about Plaintiffs' ability to demonstrate an inference of discrimination. This is particularly true in regard to Plaintiffs Spradling and Armstead. *See Blistein*, 74 F.3d at 1467 n. 7 (stating "When the replacement employee has greater qualifications, an inference that the discharge was motivated by discrimination is simply not warranted.")