Penny R. SCARBERRY, Plaintiff,

v.

PEOPLES SECURITY LIFE INSURANCE CO., Defendant.

Civil Action No. 2:95–0872.

United States District Court, S.D. West Virginia, Charleston Division.

Sept. 12, 1996.

---

John A.W. Lohmann and Brent Wolfingbarger, Wolfingbarger Law Offices, Charleston, WV, for plaintiff.

Bryan R. Cokeley and Miles G. Lawlor, Steptoe & Johnson, Charleston, WV, for defendant.

## MEMORANDUM OPINION AND ORDER

HADEN, Chief Judge.

This is an action in which Penny R. Scarberry, the Plaintiff, seeks recovery as sole beneficiary of death benefits allegedly due her because of the death of her husband Charles, an insured under a life insurance policy allegedly in force at his death. The Defendant, Peoples Security Life Insurance Company (Peoples), has moved for summary judgment on the claims. Scarberry filed a response and supplemental response to the motion. At Scarberry's request, the Court treats the supplemental response as a cross motion for summary judgment.[1] The Court **GRANTS** Peoples' motion and **DENIES** Scarberry's motion.

## I. FACTUAL DEVELOPMENT

In April 1992, Scarberry and her husband Charles met with a Peoples' agent, Earnest Sanders, to discuss life insurance. Following a further meeting among these parties and a second Peoples' representative, the Scarberrys applied for life insurance on themselves and their two children on May 29, 1992. The application provided that Charles, the "Proposed insured #1," would be the policy "own-er unless" specified otherwise. Ex. A to Def.'s mot. for summ. jgt. at 1.

Scarberry paid the initial premium with her personal check at the time of the application. She also executed a pre-authorized check agreement permitting Peoples to draw subsequent premiums "on or after the 25th day of each month" directly from her checking account. Ex. B to Def.'s mot. for summ. jgt. at 1. The Withdrawal Agreement provided as follows:

I hereby authorize [Peoples] to make withdrawals each month against the account at the institution listed at the left, for the purpose of paying premiums on the policy or policies listed on the reverse side.

Please make the withdrawal on or after the 25th day of each month. (If day is left blank, it will be based on the issue day.)

I agree that this request is subject to the terms and conditions on the reverse side.

*Id.* The reverse side of the Withdrawal Agreement states

I agree that the presentation of such withdrawals to the institution named on the reverse side shall constitute due notice of premiums being due upon the policy or policies.

I agree that if any withdrawal for the payment of premium is dishonored, or if the amount has been refunded to the bank on its request, the premium shall be considered to be in default and if payment of the premium in default is not made within 31 days of the date on which such premium was due, the policy shall terminate except as may otherwise be provided in the policy.

*Id.* at 2.

Peoples issued a term life insurance policy to the Scarberrys with a "Policy Date" of August 25, 1992. Ex. C to Def.'s mot. for summ. jgt. The Policy insured the lives of each of the Scarberrys for $50,000.00 and the lives of their children for $10,000.00.

---

1. In her first response brief, Scarberry (1) complained about pending written discovery Peoples had not furnished; and (2) asserted a scheduled deposition of a Peoples' agent would provide helpful evidence. While Scarberry untimely noticed the written discovery, Peoples furnished it following the response brief. As for the agent's deposition, the Magistrate Judge prohibited it, and Scarberry did not appeal the Order.

It appears Scarberry has now abandoned her discovery arguments, given their absence from her supplemental response. The Court nevertheless finds no merit in the contentions.

The Policy provides Peoples "will pay the Death Benefit to the Beneficiary if the Insured dies while this policy is in full force." Policy at 1. "In full force" is defined as the Policy's status when each premium has been paid by its "Due Date" or "within the grace period." *Id.* at 5. The Policy also states that "[a]ll premiums are to be paid in advance[,]" and that "[p]remiums are to be paid on the Due Date for each Premium Interval." *Id.* at 6. It continues that "[t]he Due Date of a premium is the same day of the month as the Policy Date." *Id.*

The Policy contains both a grace period and default provision. The grace period provision states

> You have 31 days from a Due Date to pay a premium. This is called "the grace period." The policy will continue in full force. No interest will be charged. But, if the Insured dies during the grace period, we will subtract the unpaid premium for those 31 days. There is no grace period for the first premium.

*Id.* The default section provides "If a premium is not paid by the end of the grace period, your policy will be in default. It will cease to be in full force. The date of default is the Due Date of the unpaid premium." *Id.*

The Scarberrys separated in early 1993. Scarberry talked with Charles nearly every day though and checked her mail at their home even more frequently. Scarberry also had near-daily contact with Defendant's

agent, Sanders, who frequented her place of employment.

Up to May 1993, Peoples successfully drew from Scarberry's checking account pursuant to the Withdrawal Agreement. The May 25, 1993 premium withdrawal, however, "bounced" and was returned on June 1 for insufficient funds.[2] Peoples attempted to draw again on June 7, 1993 but that withdrawal too was returned on June 8 for the same reason.

Scarberry testified insufficient funds were in her account because she "just messed up." Dep. of Penny R. Scarberry at 50. Overdraft notices were apparently sent to her on June 1 and June 8, 1993. She admits receiving at least one of these notices. She knew it related to the premium due Peoples.[3]

Scarberry claims after receiving the overdraft notice she immediately deposited funds to cover the premium. Bank records are sketchy on this point, but an affidavit from an official at Scarberry's bank states that at no time between May 28 and July 9 did the account ever have sufficient funds to cover the cost of the premium withdrawal. Indeed, between May 21 and July 1, 1993 the account registered six other overdrafts, including two to another insurance company with a similar withdrawal arrangement.

Scarberry testified that on or about June 10, 1993 she attempted to contact Sanders to (1) inform him she was discontinuing use of

---

**2.** Scarberry asserts Peoples *"never* attempted to make [the premium] withdrawals any earlier than the twenty-seventh day of the month" during the nine months following the Policy's issuance. Pl.s' supp. resp. br. at 5. While bank records might suggest this is true at first glance, a closer inspection reveals otherwise.

According to Richard Blalock, Peoples Manager of Policy Services, the automatic withdrawals are effected by electronic entries made with the Federal Reserve. After the entry is made, it is routed through the Federal Reserve system to trigger a debit of the policy holder's checking account at his or her local bank. Blalock stated it was Peoples' policy to initiate the process for automatic premium withdrawals from policy holders' accounts "on the earliest date authorized by" the Withdrawal Agreement. Aff. of Richard Blalock ¶ 4. According to documentation from 1993 attached to Blalock's affidavit, Peoples religiously made its entries for Scarber-

ry's monthly premiums with the Federal Reserve on the twenty-fifth day of each month. Likewise, the May withdrawal was initiated on May 25, 1993. As put by Peoples though "the vagaries of the Federal Reserve banking system delayed the . . . action[] from reaching the plaintiff's checking account until May 28, 1993." Def.'s sec. supp. reply at 3.

**3.** In addition to these notices, Peoples claims it sent Scarberry a June 10, 1993 notice informing her the May 1993 premium withdrawal was returned. The notice instructed her to complete and return certain forms within 10 days or the premium mode of the Policy would be changed. Scarberry does not remember receiving the notice. Given the parties' conflict on Scarberry's receipt of the notice, the Court treats it as having not been received.

her checking account; and (2) ascertain how to mail her premiums directly to Peoples.[4]

On June 27, 1993 Charles Scarberry was killed in an auto accident. Plaintiff advised Sanders of the tragedy the next day. Sanders later informed her Peoples had denied coverage. The denial of coverage apparently was based on the Policy not being in full force on the date of death due to non-payment of premiums.

Peoples, however, mailed Scarberry a premium notice postmarked June 28, 1993. The premium notice lists the due date in two places as May 25, 1993. The amount due is listed as $325.85. Language at the bottom of the notice provides as follows though: "Your policy will be in force only to the extent of any nonforfeiture option or cash value it may contain, unless total payment due is made prior to expiration of the grace period."

Peoples also mailed a "LAPSE NOTICE" postmarked July 8, 1993 to Scarberry. It informed her as follows:

The grace period on your insurance policy has expired and your coverage has lapsed. We at [Peoples] value our relationship with you, and we want to continue to serve your insurance needs.

You may apply for reinstatement by completing the information below and mailing it and your remittance in the enclosed envelope, or contact your Peoples ... agent.

Ex.B, Pl.'s resp. br. (footnote added). Later in the notice appears the phrase "PLEASE DISREGARD IF *TIMELY* PAYMENT HAS ALREADY BEEN MADE[.]" *Id.* (emphasis added).

Scarberry complained to the West Virginia Insurance Commissioner about the denial of coverage. The Commissioner closed the investigation without taking any action against Peoples. During the investigation Brad McCoy, an account manager for Peoples, disclosed he had contacted Charles in June 1993 and told him of the overdue payment:

Mr. Scarberry informed me that he was separated from his wife and that he did not know if they intended to keep the insurance. I informed Mr. Scarberry that his policy was in danger of lapsing and if they intended to keep the policy in force, they should forward their premium as soon as possible.

Ex. I, Pl.'s supp. resp.

Scarberry filed the instant complaint on June 26, 1995. She alleges claims for (1) breach of contract; and (2) violations of the West Virginia Unfair Trade Practices Act, *West Virginia Code* § 33–11–1 *et seq.*[5]

## II. DISCUSSION

### A. The Summary Judgment Standard:

Our Court of Appeals has often stated the settled standard governing the disposition of a motion for summary judgment:

A moving party is entitled to summary judgment 'if the pleading[s], depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to

---

4. Sanders admits Scarberry phoned his wife's tax office to get the mailing address for the premium. Sanders wife took the message and gave it to Sanders. Sanders laid the message aside, however, and never returned the call because "[a]fter a few days elapsed, [he] figured she had gotten the address from another source, since she did not call [him] again." Ex. F, Pl.'s supp. resp. br. Scarberry testified she did not call Sanders back because she "had so much going on" and she thought he was going to call her. Scarberry dep. at 68–69.

5. The bases for the breach of contract claim are threefold. First, Scarberry asserts Peoples breached its alleged duty to notify her of an intent to cancel the Policy. Second, she claims "the language ... utilized by [Peoples] to inform [her] that the policy ... would lapse or be can-

celled was not 'clear, definite and certain' and did not contain ... 'a clear expression of intent to cancel the policy that the intent to cancel would be apparent to the ordinary person.'" Pl.'s supp. resp. br. at 2. Third, she asserts Peoples' attempts to inform her the Policy would be cancelled or lapsed were negated by the June 28 premium notice.

On the Unfair Trade Practices claim, Scarberry presumably alleges violations of *West Virginia Code* §§ 33–11–4(9)(a) and (f). She asserts Peoples (1) misrepresented pertinent facts relating to the coverages at issue; and (2) failed to effectuate prompt settlement of her claims after liability became reasonably clear. Scarberry asserts the alleged misconduct "is a general business practice of [Peoples]." Compl. ¶ 32.

material fact and that the moving party is entitled to judgment as a matter of law.' Fed.R.Civ.Pro. 56(c). *See Charbonnages de France v. Smith,* 597 F.2d 406 (4th Cir.1979).

A genuine issue exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.' *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). In considering a motion for summary judgment, the court is required to view the facts and draw reasonable inferences in a light most favorable to the nonmoving party. *Id.* at 255, 106 S.Ct. at 2514. The plaintiff is entitled to have the credibility of all his evidence presumed. *Miller v. Leathers,* 913 F.2d 1085, 1087 (4th Cir.1990), *cert. denied,* 498 U.S. 1109, 111 S.Ct. 1018, 112 L.Ed.2d 1100 (1991). The party seeking summary judgment has the initial burden to show absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). The opposing party must demonstrate that a triable issue of fact exists; he may not rest upon mere allegations or denials. *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. A mere scintilla of evidence supporting the case is insufficient. *Id.* *Shaw v. Stroud,* 13 F.3d 791, 798 (4th Cir.), *cert. denied,* — U.S. ——, 115 S.Ct. 67, 130 L.Ed.2d 24, — U.S. ——, 115 S.Ct. 68, 130 L.Ed.2d 24 (1994); *see also Spradling v. Blackburn,* 919 F.Supp. 969, 974 (S.D.W.Va. 1996). Accordingly, it is through this analytical prism the Court evaluates the parties' motions.

## B. Breach of Contract Claim:

There are two controlling questions in determining whether Peoples breached any duty owed to Scarberry. First, the Court must ascertain whether the Policy was "in full force" at the time of Mr. Scarberry's death. Second, it must determine whether

there was an explicit or implicit duty imposed on Peoples by the Policy or West Virginia law to provide Scarberry with notice of lapse or impending lapse.

■ As for the first issue, the Policy's death benefit is payable only if Charles died while the Policy was "in full force." The Policy is "in full force" only if premiums have been paid either on their "[ (1) ] Due Date or [ (2) ] within the grace period." The Policy unambiguously dictates the "Due Date" applicable here was May 25, 1996, the same day of the month as the Policy date. Scarberry did not pay the premium by May 25. She thus fails to satisfy the first alternative prong of the full force definition.

The determination of whether Charles died within the grace period is slightly more complex. According to the Withdrawal Agreement signed by Scarberry though, the parties

agree[d] that if any withdrawal for the payment of premium is dishonored ... the premium shall be considered to be in default and if payment of premium in default *is not made within 31 days of the date on which such premium was due,* the policy shall terminate....

*Id.* (emphasis added). The Policy's grace period provision similarly provides "[y]ou have 31 days from a Due Date to pay a premium." The default provision states that if the premium is not paid by the end of the grace period, it will be in default and not in full force. It further provides the date of default reverts back to the due date of the unpaid premium.

■ Under the most generous reading of the Policy then, given the due date of May 25, a death benefit would be payable only if Charles died on or before June 25, 31 days after the due date. Charles died on June 27. Accordingly, no death benefit was payable under the Policy.[6]

---

6. Scarberry makes a number of flawed arguments to avoid this result. First, she asserts the June 28, 1993 premium notice and the July 8 lapse notice estop Peoples from claiming the Policy was not in full force at the time of her husband's death. Initially, Scarberry cannot prove the necessary elements for estoppel, espe-

cially reliance. *See, e.g.,* syl. pt. 6, *Stuart v. Lake Washington Realty Corp.,* 141 W.Va. 627, 628, 92 S.E.2d 891, 893 (1956); *Hunter v. Christian,* 191 W.Va. 390, 394, 446 S.E.2d 177, 181 (1994) (per curiam). After receiving the premium notice, Scarberry stated "they said they weren't going to pay me, so why should I send them three hun-

■ The Court next addresses whether Peoples had an explicit or implicit duty pursuant to the Policy or West Virginia law to provide Scarberry with notice of lapse or impending lapse. Scarberry does not suggest an explicit duty. She must therefore rely on the existence of an implicit duty, if one is available, in West Virginia decisional law.

The Court has reviewed the Policy in detail and every conceivably applicable West Virginia case. No implicit duty exists. All of the cases cited by Scarberry, or those located independently by the Court, that find or suggest such a duty are based either on (1) an explicit statutory or contractual provision; or (2) facts wholly distinguishable from the instant case. *See, e.g., Conn v. Motorist Mut. Ins. Co.,* 190 W.Va. 553, 555, 439 S.E.2d 418, 420 (1993) (involving sufficiency of notice required explicitly by statute and contract);[7] *Firstbank Shinnston v. West Virginia Ins. Co.,* 185 W.Va. 754, 760, 408 S.E.2d 777, 783 (1991) (contractual duty); *Smith v. Municipal Mut. Ins. Co.,* 169 W.Va. 296, 298, 289 S.E.2d 669, 670 (1982) (involving sufficiency of notice required explicitly by statute and contract); *Staley v. Municipal Mut. Ins. Co.,* 168 W.Va. 84, 86, 282 S.E.2d 56, 58 (1981) (involving sufficiency of notice required explicitly by statute); *Laxton v. National Grange Mut. Ins. Co.,* 150 W.Va. 598, 600, 148 S.E.2d 725, 727 (1966) (explicit contractual duty), *overruled on other grounds by Smith,* 169 W.Va. at 301, 289 S.E.2d at 671.[8]

dred and some dollars." Scarberry dep. at 97. Further, the premium notice itself warned the Policy holder of the possibility of an extant default in stating "[y]our policy will be in force only to the extent of any nonforfeiture option or cash value it may contain, unless total payment due is made prior to expiration of the grace period." Ex. A to Pl.'s resp. br. Finally, Scarberry's argument runs counter to the unambiguous provisions of the Policy. The doctrine of estoppel is clearly inapplicable on these facts. *See, e.g.,* syl. pt. 3, *Humble Oil & Refining Co. v. Lane,* 152 W.Va. 578, 579, 165 S.E.2d 379, 381 (1969) (noting estoppel "should be applied cautiously and only when equity clearly requires it to be done.").

Next, Scarberry asserts the grace period should be calculated from May 28, the day she asserts Peoples unsuccessfully attempted to withdraw the May 25 premium from her account. It is undisputed, however, that Peoples completed all steps necessary for the withdrawal on May 25. Scarberry implicitly suggests Peoples should have demanded payment of the premium prior to the date it was due under the policy. The Court disagrees. Further, Scarberry's proposed operative date is foreclosed by, *inter alia,* the provisions in the Withdrawal Agreement concerning calculation of the grace period following dishonor of a premium payment.

The Court also rejects Scarberry's argument that her lone phone message left with Sanders' office, requesting information on where to mail her premium after her check bounced, somehow tolls the grace period. Scarberry left one phone message nearly two weeks after the withdrawal was dishonored. It would be inequitable and contrary to law to permit her less-than-diligent efforts to modify the unambiguous terms of the Policy and Withdrawal Agreement.

7. Scarberry also relies on *Conn* in support of her argument the June 28 premium notice prevented her Policy from lapsing. *Conn* does not support her position for several reasons. First, and most importantly, *Conn* dealt with the *sufficiency* of a notice that was *required* by the contract and statute. Given no such notice was required here, its sufficiency is irrelevant. Second, *Conn* involved cancellation rather than the default and lapse present here. Third, unlike the instant case, the defective premium notice in *Conn* came prior to the cancellation date and notice from the insurer it would not pay benefits.

8. Scarberry's best case is *Keller v. First Nat'l Bank,* 184 W.Va. 681, 403 S.E.2d 424 (1991). A close reading, however, reveals it too is inapposite. *Keller* dealt with a bank's charge to a debtor for credit life insurance. The bank listed the charge on a renewal note. It later allegedly deleted the charge, finding it to have been imposed in error. It did not give the insured notice of the deletion and accompanying nonexistence of insurance coverage. The Supreme Court of Appeals held as follows:

In order to eliminate an insured's doubt about coverage, we find that *once an insurer creates a reasonable expectation of insurance coverage,* the insurer must give the coverage or promptly notify the insured of the denial.

*Id.* at 684, 403 S.E.2d at 427 (emphasis added).

*Keller* creates no duty here for several reasons. First, as Peoples aptly notes, "the *Keller* court cited *Staley* regarding the *sufficiency* of the required notice of cancellation, but not for the *existence* of a notification obligation." Def.'s reply to Pl.'s supp. resp. at 4. Second, *Keller* is readily distinguishable on its facts, as it dealt with an initial extension and then denial of insurance coverage and not presently existing coverage followed by a lapse. Third, unlike the circumstances present in *Keller,* Peoples did nothing between the time of demanding payment of the premium and denying coverage that would have created a reasonable expectation of insurance coverage past expiration of the grace period.

The Court thus concludes Peoples breached no duty owed Scarberry. Accordingly, Peoples is entitled to judgment as a matter of law on Scarberry's breach of contract claim.

### C. *Unfair Trade Practices Claim:*

■ The Court has determined Peoples faithfully discharged its contractual and statutory duties to Scarberry. This conclusion is consistent with the apparent lack of merit the West Virginia Insurance Commissioner accorded Scarberry's complaints. For these reasons and others, the Court concludes Peoples is entitled to judgment as a matter of law on Scarberry's unfair trade practices claim.

### III. CONCLUSION

Based on the foregoing, the Court concludes there is no genuine issue of material fact and Defendant is entitled to judgment as a matter of law. Accordingly, Defendant's motion for summary judgment is **GRANTED** and Plaintiff's motion for summary judgment is **DENIED**. This case is **DISMISSED WITH PREJUDICE** and stricken from the docket of the Court.

There is a very recent per curiam decision from the Supreme Court of Appeals applying *Staley, supra. See Elkins v. State Farm Mut. Automobile Ins. Co.,* 475 S.E.2d 504 (W.Va. July 17, 1996). Assuming that opinion was supportive of Scarberry's position, however, it would be inappropriate to rely upon it. *See Lieving v. Hadley,* 188 W.Va. 197, 201, 423 S.E.2d 600, 604 n. 4 (1992) (stating "everything in a per curiam opinion beyond the syllabus point is merely obiter dicta. . . . [I]f rules of law or accepted ways of doing things are to be changed, then this Court will do so in a signed opinion, not a per curiam opinion.").